**UNITED STATES of America, et al., Plaintiff,**

**v.**

**SOUTH FLORIDA WATER MANAGEMENT DISTRICT; Tilford Creel, Executive Director, South Florida Water Management District; Florida Department of Environmental Regulation; and Carol M. Browner, Secretary, Florida Department of Environmental Regulation, et al., Defendants.**

**No. 88–1886–CIV.**

United States District Court, S.D. Florida.

Feb. 24, 1992.

William E. Guy, Jr., Stuart, FL.

R. Benjamin Reid, Popham, Haik, Schnobrich & Kaufman, Ltd., Miami, FL.

Robert P. Smith, Jr., Hopping, Boyd, Green & Sams, Tallahassee, FL.

Martin Suuberg, Office of Sol. Gen., U.S. Dept. of Interior, Washington, DC.

Dean B. Suagee, Hobbs, Straus, Dean & Wilder, Washington, DC.

Terry S. Nelson, Miami, FL.

Eric C. Christu, Gary M. Brandenburg, Nancy G. Linnan, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, West Palm Beach, FL.

Charles C. Powers, Powers & Koons, P.A., Palm Beach Gardens, FL.

David J. White, Proenza, White & Huck, P.A., Miami, FL.

Thomas W. Reese, St. Petersburg, FL.

John A. Yaun, City Atty., Clewiston, FL.

William L. Earl, Richard Burgess, Peeples, Earl & Blank, P.A., Miami, FL.

David G. Guest, Sierra Club Legal Defense Fund, Tallahassee, FL.

## MEMORANDUM OPINION AND ORDER ENTERING SETTLEMENT AGREEMENT AS CONSENT DECREE

HOEVELER, District Judge.

The Court on this day approves and enters as a consent decree the settlement agreement ("Agreement") executed by plaintiff United States and defendants South Florida Water Management District ("District") and the Florida Department of Environmental Regulation ("DER").[1]

The Agreement resolves all claims by the original parties in a complex environmental lawsuit filed more than three years ago by the United States against the District and DER for alleged contamination of the Loxahatchee National Wildlife Refuge (the "Refuge") and the Everglades National Park (the "Park") caused by nutrient-rich farm runoff in waters released into the Refuge and Park through structures operated by the District. The United States claims that high levels of phosphorous in farm-water runoff have altered the fragile ecosystems of the Park and Refuge, producing dense cattails in place of the native sawgrass and wet prairie communities and endangering indigenous plant and animal life.

The Agreement is supported by the numerous environmental groups permitted to intervene in this action and opposed by defendant-intervenors Cities of Belle Glade and Clewiston (the "Cities") and several agricultural organizations ("Farm Interests") (collectively referred to as "defendant-intervenors"). As set forth below, the Court finds that the objections to the Agreement raised by defendant-intervenors, with one exception, are either satisfied by this Order or are without merit. The exception to which the Court refers is the objection based on the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. Nonetheless, because rejection of the Agreement on this ground alone would frustrate the very purpose behind the statute, the Court will require compliance with NEPA simultaneous with, and not as a condition to, implementation of the Agreement.

### I. THE AGREEMENT

A review of the terms of the Agreement reveals an ambitious strategy to restore and preserve the Everglades ecosystem. In broad outline, the Agreement establishes interim and long-term phosphorous concentration limits for the Park and Refuge and delineates specific remedial programs designed to achieve these limits. The remedial programs consist of stormwater treatment areas ("STAs") and a regulatory permitting program aimed at agricultural discharges from the Everglades Agricultural Area ("EAA"). The STAs, to be constructed by the District on 35,000 acres of land in the EAA, are large water filtration marshes designed to process and remove nutrients from

---

1. As used in this Order, the term "state agencies" refers to the District and DER.

agricultural runoff destined for the Park and Refuge. The STAs will thus act as a "buffer zone" between the agricultural area and the Park and Refuge, receiving stormwater directly from agricultural drainage canals and purifying the water before it enters the Park and Refuge. The regulatory program complements and lessens the work of the STAs by seeking to reduce the level of phosphorous in agricultural runoff entering the STAs. Pursuant to this program, the District or DER will regulate the water quality of agricultural discharges through a permitting scheme by which permit applicants will be required to comply with designated phosphorous load allocations and adopt best management practices aimed at reducing the levels of phosphorous in agricultural discharge. The combination of the STAs and the regulatory program are expected to achieve an 80% long-term reduction in phosphorous loads from the EAA.

In addition to these remedial measures, the Agreement establishes a research and monitoring program, a technical oversight committee to supervise the research and monitoring, and a schedule for the completion of administrative actions consistent with the terms of the Agreement.

The Agreement is notable in at least two respects. First, the basic programs and measures set forth in the Agreement track substantially the requirements of the Marjorie Stoneman Douglas Everglades Protection Act ("Everglades Protection Act"), Fla.Stat. § 373.4592 (1991), a state legislative measure enacted in response to this lawsuit. Among other things, the Everglades Protection Act requires the District to establish:

—strategies for developing programs and projects designed to bring facilities into compliance with applicable water quality standards and restore the Everglades hydroperiod, including the identification and acquisition of lands for the purpose of water treatment or implementation of stormwater management systems ... and the development of a permitting system for discharges into waters managed by the District;

—strategies for establishing research programs to measure program and project effectiveness;

—recommended ambient concentration levels and discharge limitations for phosphorous appropriate to achieve and maintain compliance with applicable state water quality standards;

—proposed interim concentration levels designed to achieve [compliance with water quality standards] to the maximum extent practicable; and

—a monitoring program to ensure the accuracy of data and measure progress toward achieving interim concentration levels and applicable water quality standards.
§§ 373.4592(3)(a)1, 373.4592(3)(a)4, 373.4592(6)(a)1, 373.4592(6)(a)2, 373.4592(6)(a)5.

These strategies and proposals are to be incorporated in the Surface Water Improvement and Management ("SWIM") plan and District permit applications required under the Everglades Protection Act.

Thus, while the Agreement undoubtedly goes further than the Act in terms of specificity, its general approach to the problem is the same.

Second, and more important from the standpoint of the Cities and the Farm Interests, the Agreement is not self-executing, but rather is subject to Florida's Administrative Procedures Act ("APA"), Fla.Stat. § 120.50 (1991) *et seq.,* which affords affected parties the opportunity to challenge proposed agency action.

Under the APA, a party whose substantial interests are or will be affected by agency action is entitled to a Section 120.57 trial-type hearing if there is a disputed issue of material fact and, ultimately, an appeal to the appropriate Florida District Court of Appeal. Fla.Stat. §§ 120.57, 120.68. The Section 120.57 hearing, presided over by an impartial hearing officer, is infused with most, if not all, of the procedural attributes of a bench trial. The parties are permitted an opportunity to respond, to present evidence and argument on the issues involved, to conduct cross-examination and submit rebuttal evidence, to file exceptions to the hearing officer's recommended order, and to be repre-

sented by counsel. § 120.57(1)(b)4. The parties may also submit pleadings and are afforded discovery prior to the hearing in accordance with the Florida Rules of Civil Procedure. §§ 120.57(1)(b)5, 120.58(1)(b). As the Section 120.57 hearing serves the dual purpose of adjudicating disputed facts and enabling parties adversely affected by the proposed action to change the agency's mind, the role of the hearing officer is to make findings of fact and determine if the evidence supports, or warrants a conclusion at odds with, the proposed action. *See Heifetz v. Department of Business Regulation*, 475 So.2d 1277, 1281 (Fla. 1st DCA 1985); *Capeletti Bros. v. State Dep't of Gen. Servs.*, 432 So.2d 1359, 1363 (Fla. 1st DCA 1983).

In considering the hearing officer's recommended order, the agency must accept the hearing officer's findings of fact if they are supported by competent substantial evidence and may not reweigh evidence, rejudge the credibility of witnesses, or use conclusions of law to overturn those findings of fact in order to fit a desired result. § 120.57(1)(b)10; *See Heifetz*, 475 So.2d at 1281; *South Florida Water Management Dist. v. Caluwe*, 459 So.2d 390, 394–95 (Fla. 4th DCA 1984); *McDonald v. Dep't of Banking and Finance*, 346 So.2d 569 (Fla. 1st DCA 1977). If the agency determines that the officer's findings of fact are not supported by the record, the reasons underlying this conclusion must be stated with particularity in its final order. § 120.57(1)(b)10. The agency's final order, and thus its compliance with the above requirements, is subject to judicial review in the Florida District Courts of Appeal. *See* § 120.68. It is by virtue of these procedures that the APA ensures that an agency's final action is supported by the evidence developed in the record.

Because the regulatory measures called for in the Agreement are to be undertaken by the District and DER and therefore constitute "agency action" subject to the APA, substantially affected parties, including the Cities and the Farm Interests, will be able to subject these measures to independent administrative and judicial scrutiny. To the extent, then, that the agencies' implementation of the Agreement may ultimately impose burdens on the Cities and the Farm Interests, these burdens will be imposed only as a result of an administrative process in which the Cities and Farm Interests are allowed to participate, and only if they are warranted by the facts as developed in that process.

The Cities and the Farm Interests do not dispute the adequacy of the APA in protecting their interests with regard to the actions contemplated by the Agreement. To the contrary, they have made it clear that they would prefer that the issues raised by this lawsuit be adjudicated in the state administrative process. Their primary concern is that to the extent that the Agreement binds the agencies to a particular course of regulatory action, their administrative rights are rendered meaningless because the Agreement will have predetermined the final agency action. *See Capeletti Bros.*, 432 So.2d at 1364 ("Section 120.57 proceedings are intended to formulate final agency action, not to review action undertaken earlier and preliminarily."). If, in fact, the Agreement is a *fait accompli*, then an administrative hearing is an exercise in futility.

In response to this concern, the settling parties have submitted a Joint Status Report which makes clear that the Agreement is not intended to require the agencies to favor the terms of the Agreement over a hearing officer's contrary findings of fact supported by competent evidence. As interpreted by the Court, the intention of the settling parties is that the agencies are bound in only two respects as far as the administrative process is concerned. First, the agencies must propose those measures set forth in the Agreement which are subject to the APA. They are not, however, required to adopt these measures as final action in the face of conflicting findings of fact or if persuaded that such action goes against the weight of the evidence established in the Section 120.57 hearing. Indeed, should the state administrative process result in a finding inconsistent with that contemplated by the Agreement, the state agencies, consonant with their obligations under state law, must respect that result. Second, the agencies are "bound" in the sense that if the outcome of the administrative process precludes them

from undertaking final action consistent with the terms of the Agreement, and if the settling parties are unable to agree to a modification of the Agreement after resort to dispute resolution or upon a claim of force majeure,[2] the United States retains the right to return to this Court and have the dispute resolved in a federal forum. Significantly, the Agreement does not dictate how this dispute must be resolved.

So construed, the Agreement imposes a process rather than a result, in effect recognizing an administrative framework while preserving this Court's ultimate jurisdiction over this lawsuit.

As indicated at the December 4, 1991, status conference, the Court proposes to address defendant-intervenors' concerns with regard to the APA by incorporating in this Order, and making part of the Agreement, terminology which insures that the administrative hearing is meaningful. To that end, the following language, taken in large part from the Joint Status Report and the settling parties' submission of proposed language, is hereby made part of the Agreement[3]:

1. The Agreement does not predetermine the outcome of any state proceedings required under Chapter 120, Florida Statutes. Accordingly, any provision of the Agreement that under Florida law must be implemented by the state agencies through administrative proceedings governed by Chapter 120, Florida Statutes, shall have no binding effect upon the agencies within such administrative proceedings and with regard to the agencies' consideration of the hearing officer's recommended order. In any such proceedings, points of entry will be provided as required by law.

2. Nothing in the Agreement is intended or operates to abrogate the District's and DER's duties to act in accordance with

Florida law. Indeed, the Agreement requires the District and DER to fulfill their obligations under existing state law, including the duty to weigh competing evidence on issues of fact or policy, particularly in light of an impartial administrative hearing officer's decision that the evidence warrants a conclusion at odds with the Agreement. Specifically, the Agreement does not require the agencies to favor the terms of the Agreement over a hearing officer's contrary findings of fact supported by competent, substantial evidence.

Having thus clarified the intention and operation of the Agreement, the Court now turns to the remaining objections raised by the Cities and the Farm Interests.

## II. DEFENDANT–INTERVENORS' OBJECTIONS

The Cities and the Farm Interests advance a number of arguments in opposition to Court approval of the Agreement. The principal contentions raised are that: (1) the Agreement illegally imposes duties and obligations on defendant-intervenors and undermines their rightful interests; (2) the Court lacks authority to enter a consent decree based on state law claims; (3) the Attorney General lacks authority to maintain and settle this action without the concurrence of other federal agencies; (4) the Agreement impermissibly restricts the discretion of federal agencies by requiring them to undertake certain actions in furtherance of the Agreement's objectives; (5) the Agreement violates the Flood Control Act; and (6) the remedial measures contemplated by the Agreement constitute "major federal action" under NEPA, necessitating preparation of an environmental impact statement. These arguments are addressed, in turn, below.[4]

---

2. The force majeure clause in the Agreement, ¶ 23, includes "unavoidable legal barriers or restraints, including those arising from the actions of persons not Parties to this Agreement."

3. By incorporation of this language, the Court disposes of defendant-intervenors' arguments based on the APA and the Farm Interests' due process argument. The suggestion that the parties be bound by the results of the administrative

process is rejected for the reason stated in the Court's Order of December 5, 1991.

4. Defendant-intervenors' arguments based on alleged state law violations are not addressed as these issues are not properly before the Court; defendant-intervenors have advised the Court that the state law issues are presently pending in, and "properly resolved by," the state courts, and are raised here only to "alert" the Court to their existence. *Farm Interests' brief,* at 32–33. *See*

## A. Impact on Nonconsenting Parties

■ Defendant-intervenors contend that the Agreement impermissibly imposes direct duties and obligations upon them, or otherwise undermines their rightful interests. *See Local No. 93 v. City of Cleveland,* 478 U.S. 501, 529–30, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986). In particular, the Farm Interests cite the regulatory permitting program, with its requirements of reduced phosphorous loads in farm runoff and adoption of best management practices, and the acquisition of 35,000 acres of farmland for construction of the STAs. The Cities contend that the Agreement requires them to incur financial obligations, obtain permits not heretofore required, and modify existing permits.

This argument misconstrues the nature of the Agreement, as clarified above. The Agreement does not require anything of defendant-intervenors nor does it accomplish of its own force and effect any of the terms which might impair their interests. Certainly the defendant-intervenors cannot claim to incur burdens as a result of actions which are merely proposed. Yet as far as their interests are concerned, that is all the Agreement accomplishes. As noted earlier, any duties or obligations imposed upon defendant-intervenors will come about only as a result of an administrative process in which they are allowed to participate, and not by virtue of this Court's approval of the Agreement.

If indeed it turns out that the defendant-intervenors are unable to persuade an impartial hearing officer that the terms of the Agreement are scientifically unsound or otherwise unwarranted, the result is neither "unreasonable nor proscribed." *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981).

### B. The Court's Authority to Enter a Consent Decree

Defendant-intervenors also argue that the Court lacks authority to enter a consent decree based on state law claims. This contention is both factually and legally incorrect.

■ Inexplicably, defendant-intervenors fail to recognize the presence of the federal contract claims in Counts III and IV of the United States' Second Amended Complaint. These claims, alleging breaches of two separate contracts between the United States and the District, are governed by federal, not state, law. *See United States v. Seckinger,* 397 U.S. 203, 209–10, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *United States v. Allegheny County,* 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944), *overruled on other grounds by United States v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958) (as noted in *United States v. Fresno County,* 429 U.S. 452, 462 n. 10, 97 S.Ct. 699, 705 n. 10, 50 L.Ed.2d 683); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943); *United States v. South Florida Water Management Dist.,* 922 F.2d 704, 711 (11th Cir.1991).

■ Even if the Agreement seeks to vindicate only the state law claims, the Court has authority to enter a decree resolving those claims as a result of its subject matter jurisdiction under 28 U.S.C. § 1345. As long as a consent decree "spring(s) from and serve(s) to resolve a dispute within the court's subject matter jurisdiction," the court is empowered to enter the decree if it comes within the scope of the case made by the pleadings and advances the objectives of the law it is intended to enforce. *Local No. 93 v. City of Cleveland,* 478 U.S. at 525, 106 S.Ct. at 3076. *Accord Sansom Comm. v. Lynn,* 735 F.2d 1535, 1538 (3d Cir.1984); *Camden County Jail Inmates v. Parker,* 123 F.R.D. 490, 497–98 (D.N.J.1988). Or, as one court has stated: "The power of a court to enter a consent decree emanates from its authority to adjudicate the rights of the parties in the first instance." *Lasky v. Continental Products Corp.,* 804 F.2d 250, 254 (3d Cir.1986).

*Cities' brief,* at 27. Since the defendant-intervenors do not wish this Court to decide these issues, it will not do so. The Court also declines to stay entry of a consent decree pending resolution of these issues by the state courts.

The Court further refrains from addressing the Farm Interests' argument based on the Farmland

Protection Policy Act (FFPA), 7 U.S.C. § 4201 *et seq.* The FFPA, by expressly prohibiting private causes of action based on its provisions, *id.* § 4209, precludes judicial review of compliance with its terms.

*Kasper v. Board of Election Comm'rs*, 814 F.2d 332 (7th Cir.1987), cited by defendant-intervenors, is inapposite. In that case, the Seventh Circuit found that an overriding federal interest was necessary to justify a consent decree which would have committed the defendant, the Chicago Board of Election Commissions, to *violate* state law. *Kasper* thus stands for the proposition that, in the absence of a violation of federal law which might warrant relief inconsistent with state law, state agencies may not by consent decree "liberate themselves from the statutes enacted by the legislature that created them." *Id.* at 342. Nothing about this holding suggests that a consent decree cannot be based on state law claims.

In short, because this Court has subject matter jurisdiction over the United States' claims, it has the power to enforce the Agreement as a consent decree.

## C. The Attorney General's Authority to Maintain and Settle This Action

The Farm Interests allege that the Attorney General lacks authority to maintain, and therefore settle, this action because, according to the Farm Interests, the authority to pursue the claims presented in this case belongs exclusively to other federal agencies whose concurrence in the filing and maintenance of this suit has not been sufficiently established. The question of the Attorney General's authority, initially raised in the Farm Interests' brief in opposition to the motions for approval of the settlement, also forms the basis of a separate Motion for Court Inquiry filed by the Florida Sugar Cane League, Inc. (the "League"), a member of the Farm Interests. The Court has accordingly considered the authority cited in both memoranda and finds nothing therein which arguably lends support to this claim.

■ Without attempting to cover every case and statute invoked by the Farm Interests and the League, the following examples are representative of the degree to which their argument depends upon misstatement and misapplication of the authority cited.

For instance, Farm Interests have cited (but not quoted) the following statutes as requiring that "[p]rior to initiating an action to enforce the property interests of the United States, the Attorney General must be 'retained' by client agencies to represent federal interests within the responsibility of the agency requesting help." *Farm Interests' brief*, at 50:

28 U.S.C. § 512. **Attorney General to advise heads of executive departments:** The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department.

28 U.S.C. § 514. **Legal services on pending claims in departments and agencies:** When the head of an executive department or agency is of the opinion that the interests of the United States require the service of counsel on the examination of any witness concerning any claim, or on the legal investigation of any claim, pending in the department or agency, he shall notify the Attorney General, giving all facts necessary to enable him to furnish proper professional service in attending the examination or making the investigation, and the Attorney General shall provide for the service.

28 U.S.C. § 517. **Interests of United States in pending suits:** The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a Court of the United States, or in a court of a State, or to attend to any other interest of the United States.

28 U.S.C. § 518. **Conduct and argument of cases:** (a) Except when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court and suits in the United States Claims Court or in the United States Court of Appeals for the Federal Circuit and in the Court of International Trade in which the United States is interested. (b) When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United

States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.

As is obvious, these statutes do not stand for the proposition asserted. Moreover, Farm Interests have conspicuously ignored 28 U.S.C. §§ 516 and 519, which reserve to the Attorney General, absent express congressional directive to the contrary, the authority to conduct and supervise all litigation to which the United States is a party.[5]

In an attempt to demonstrate that the Attorney General's authority to bring this action depends on the concurrence of other federal agencies, the Farm Interests refer to the Environmental Protection Agency's authority to implement and enforce the Clean Water Act, 33 U.S.C. § 1251 *et seq.* However, none of the United States' claims in this case are based on the Clean Water Act.

The League's filing fares no better. For example, in support of its contention that the Secretary of the Interior has exclusive authority to determine whether legal action should be taken to protect federal parks and refuges, the League cites *Organized Fishermen of Florida v. Hodel*, 775 F.2d 1544 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986), and *Kidd v. United States Dep't of Interior, Bureau of Land Management*, 756 F.2d 1410 (9th Cir. 1985). In fact, these cases, involving private challenges to regulatory decisions brought under the federal Administrative Procedures Act, 5 U.S.C. § 706(2)(A), merely affirmed the Interior Department's broad discretion to *regulate the use and management* of federal lands. *See Organized Fishermen*, 775 F.2d at 1550 ("[t]he task of weighing the competing uses of federal property has been delegated by Congress to the Secretary of the Interior. Consequently, the Secretary has broad discretion in determining how best to protect public land resources."); *Kidd*, 756 F.2d at 1412 ("Congress' constitutional power

over the proper administration and disposition of the public lands is without limitation."). The question of authority to initiate civil action to protect federal property was simply not at issue in these cases.

The League also relies on the following provision in the 1980 Department of Justice Appropriation Act:

> The Attorney General may, with the concurrence of any agency or department with primary enforcement responsibility for an environmental or natural resource law, investigate any violation of an environmental or natural resource law of the United States, and bring such actions as are necessary to enforce such laws.

Pub.L. No. 96–132, § 12, 93 Stat. 1040, 1048 (1979).

The plain wording of this statute makes clear that it applies only to actions to enforce federal environmental laws. This action is based on state law and federal contract claims; no federal environmental or natural resource law is at issue in this case.

As a final example, the League cites *United States v. Solomon*, 563 F.2d 1121 (4th Cir.1977), as holding that "the [Department of Justice] does not have general discretionary authority to file civil actions within the purview of other federal agencies without the authorization and concurrence of those agencies." *League's Memorandum in Support of Motion for Court Inquiry*, December 13, 1991, at 4. In *Solomon*, the Fourth Circuit held that the United States as a whole lacked statutory authority and standing to sue to protect the constitutional rights of the mentally retarded. Significantly, the court distinguished the situation in which the United States sues to protect its property interests, in which case no explicit statutory authorization is required. 563 F.2d at 1126 (citing cases). The question of the authority of the United States as a whole to bring suit is, of

**5.** 28 U.S.C. § 516. **Conduct of litigation reserved to Department of Justice:** Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

28 U.S.C. § 519. **Supervision of Litigation:** Except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties.

course, a separate issue from the question of which federal agency is responsible for initiating suit. As to the latter question, the court expressly stated that "if the United States had authority to bring the suit, the Attorney General of the United States is the one to act as its counsel." *Id.* at 1124 (citing 28 U.S.C. §§ 516–519). *Solomon* not only lends no support to the League's argument, but indeed bears no resemblance to the characterization of its holding advanced by the League.

Although the Farm Interests' and the League's reliance on inapplicable authority is enough to warrant a conclusion that their challenge to the Attorney General's authority is without legal foundation, the issue of the concurrence of other federal agencies in this action is, in any event, a red herring.

The cooperation of numerous federal resource agencies in this litigation is evident from the United States' witness list, which includes, among others, personnel from the National Park Service, Fish and Wildlife Service, Environmental Protection Agency, Soil Conservation Service, and Army Corps of Engineers. *United States' Revised Designation of Expert Witnesses*, November 19, 1990. With respect to the Department of the Interior, Assistant Interior Secretary Constance Harriman was quoted in a press article dated November 14, 1990, as stating: "We're pursuing an aggressive litigation strategy. What's at risk is a precious national park—a world heritage site—and an important wildlife refuge. [The damage sustained] is as bad as you can get. We've got to have relief." *Miami Herald*, November 14, 1990. (Exhibit 2 of *United States' Opposition to Defendant–Intervenor's Motion for*

*Court Inquiry*, January 27, 1992). Further, when the settlement reached in this case was announced, the Secretary of the Interior, Manuel Lujan, issued a press release hailing the settlement as a "major step toward solving the water quality problems which threaten the park and the refuge" and as "the beginning of a new era of partnership designed to meet the goal of responsible stewardship of our public lands." (Exhibit 3 of *United States' Opposition to Defendant–Intervenor's Motion for Court Inquiry* ).

While it may or may not be true that, as the Farm Interests and the League contend, the concurrence of other federal agencies occurred only after the suit was filed, this point is irrelevant in light of the Farm Interests' and the League's failure to demonstrate that this concurrence was ever needed in the first place.

Having been referred to no authority which suggests that the Attorney General lacks the authority to pursue and settle the claims in this case, the Court finds this argument to be without merit.

### D.  Infringement of Federal Agency Discretion

■ The Farm Interests claim that the Agreement illegally infringes upon the discretionary authority of federal agencies by requiring these agencies to defend the Agreement against outside challenges, by requiring their assistance in research and monitoring, and by requiring the Army Corps of Engineers (the "Corps") to modify its regulation of the Central and Southern Florida Project (the "Project") in support of the Agreement's objectives.[6]

---

6. The Farm Interests cite other terms of the Agreement which purportedly restrict federal agency discretion, e.g., the water quality levels and limits established for the Park and Refuge, the conversion of farmland to STAs, and funding for research and monitoring.

With respect to the phosphorous concentration levels and limits for the Park and Refuge and the construction of STAs on farmland, no federal agency discretion is implicated because these measures are to be accomplished by the state agencies pursuant to their own regulatory authority and responsibilities. *Compare Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1219, 104

S.Ct. 2668, 81 L.Ed.2d 373 (1984), *discussed infra*. Were it otherwise, resort to the state administrative process would be unnecessary. If the Farm Interests mean to suggest that the United States cannot allow itself to be bound by the terms of the Agreement, this argument fails of its own effect, which would be to invalidate every decree and agreement, including criminal plea bargains, entered into by the United States.

As far as funding is concerned, the Agreement imposes no funding obligations on any federal agency. The only reference to federal funding in the Agreement is found in ¶ 11.F, which provides, *inter alia*, that funds available under the Clean Water Act "can be granted" to the state agencies for approved monitoring programs.

A similar argument was addressed in *Gorsuch*, 718 F.2d at 1127–29. In *Gorsuch*, a group of industries challenged a consent decree which established certain procedures and criteria to be employed by the Environmental Protection Agency ("EPA") in promulgating regulations under the Clean Water Act. In rejecting the industries' argument that the decree impermissibly restricted the EPA's discretion by prescribing the method to be used by the agency in developing its regulations, the appellate court emphasized that the terms of the decree were shaped, and voluntarily agreed to, by the EPA:

> The Decree here was largely the work of the EPA and the other parties to these suits, not the district court; manifestly, the requirements imposed by the Decree do not represent judicial intrusion into the Agency's affairs to the same extent they would if the Decree were 'a creature of judicial cloth.'

*Id.* at 1128 (citation omitted). Because the EPA had consented to the decree, the situation in *Gorsuch* was distinguishable from cases in which agencies were ordered, against their will, to take action otherwise committed to their discretion. *See, e.g., National Ass'n of Postal Supervisors v. United States Postal Serv.,* 602 F.2d 420 (D.C.Cir. 1979) (district court interfered with Postal Service's broad discretion over management affairs in ordering the Service to maintain specific salary differential between management personnel and rank-and-file employees).

In this case, the Agreement before the Court, to be entered as a consent decree, is arguably less intrusive of federal agency discretion than the decree in *Gorsuch*. Whereas the federal agency in *Gorsuch* was in a defensive position, the United States initiated and aggressively pursued this action; any commitments it has made are in furtherance of its own independently-sought objectives. To hold that the various federal agencies which have participated in this suit cannot commit themselves to undertake action in support of an outcome which they affirma-

This is an affirmation, not a restriction, of the Environmental Protection Agency's funding au-

tively seek, i.e., restoration of the Everglades, is itself an infringement of their discretion to settle this lawsuit in the manner they best see fit.

Since any commitments embodied in the Agreement come with the endorsement and at the urging of the United States, the Agreement does not impermissibly infringe upon the discretion of the federal agencies involved.

### E. The Flood Control Act

■ Defendant-intervenors contend that the Agreement, by establishing new water quality and quantity standards applicable to the Project, imposes immediate and significant modifications to the Project which elevate environmental considerations over the Project's primary purposes of flood control, reclamation, irrigation, and water supply. Such modifications, it is noted, require prior congressional approval under the Flood Control Act, 33 U.S.C. § 701, *et seq.* The United States' position is that the Agreement is entirely consistent with the broad aims of the Project, which include protection of fish and wildlife resources in addition to flood control and other stated purposes. *See generally Environmental Defense Fund v. Alexander,* 467 F.Supp. 885, 899–902, 908–10 (N.D.Miss. 1979) (discussing the Corps' discretionary authority to make post-authorization modifications to projects which do not materially alter authorized project purposes); *Creppel v. Army Corps of Engineers,* 670 F.2d 564, 572–73 (5th Cir.1982) (same).

Although the position of both parties seems to suggest that a comparison of the terms of the Agreement with the Project's purposes is in order, the Court finds this task unnecessary since the Agreement does not mandate any specific or concrete modification to the Project such as would trigger the requirement of congressional approval.

The Corps' duties under the Agreement are set forth in ¶ 15:

> The Corps shall apply to DER for stormwater management permit(s) ... for the operation of S–10, S–11, and S–12 water

thority under the Clean Water Act.

control structures, and for the construction and operation of new structures which may affect the Park or Refuge, and shall comply with reasonable permit terms and conditions relating to the abatement of water quality problems addressed in the Agreement. For existing structures S–10, S–11, S–12, the Corps shall apply on or before October 1, 1991. The DER anticipates that stormwater management permits for these existing structures may include monitoring, adjustments to regulatory schedules and participation in research consistent with this Agreement..... The Corps agrees to cooperate in the modification of its regulation of the [Project] in order to support the objectives set forth in this Agreement. New structures to be designed and constructed by the Corps shall be designed and constructed in a manner consistent with this Agreement.

In complying with these terms, the Corps may very well modify certain aspects of the Project, but Paragraph 15 clearly does not embody any specific or definite plan for modification of the Project. Hence, any alterations to the Project are, at this stage, purely conjectural and hypothetical. More fundamentally, because the Agreement itself contains no concrete proposal for modifications to the Project, the Court's approval of the Agreement does not implicate the Flood Control Act for the very reason that the Court cannot be approving or requiring what is not in the Agreement. Whether the Corps' implementation of its part of the Agreement will result in specific plans to alter the Project is an issue which need not and should not be resolved at this juncture. For present purposes, it is sufficient that the Agreement itself imposes no such modifications and, as such, does not require congressional authorization.

### F. NEPA

■ NEPA requires federal agencies to submit an environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The purpose of the EIS re-

quirement, and NEPA as a whole, is to inject environmental considerations into the decisionmaking processes of federal agencies by forcing agencies to take a "hard look" at the environmental consequences of their actions. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989) (citation omitted); *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981).

■ There is no question but that the remedial measures contemplated by the Agreement will significantly affect the environment; that is the whole purpose of the Agreement. Further, the fact that these measures are intended to benefit the environment does not necessarily render them beyond the scope of NEPA's requirements. As the Fifth Circuit has observed, "The proper question is not the intent behind the actions, but the significance of the new environmental impacts ... NEPA is concerned with all significant environmental effects, not merely adverse ones." *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 993 (5th Cir. Unit A, July 13, 1981) [7] (citation omitted). *Accord National Wildlife Federation v. Marsh,* 721 F.2d 767, 782–83 (11th Cir. 1983). In a similar vein, the Council on Environmental Quality ("CEQ"), which is charged with developing guidelines implementing NEPA's provisions, includes beneficial impacts in its definition of "significant effects" on the environment. 40 C.F.R. § 1508.27(b)(1). While the courts and the CEQ have not clearly articulated the purpose served by requiring an EIS for actions intended to benefit the environment, application of NEPA's mandate to such actions may stem from an implicit recognition that even the most well-intentioned environmental project can have unintended negative effects.

NEPA, however, applies only to "federal" actions. Accordingly, the critical questions before this Court are whether the Agreement's remedial measures constitute federal action and, if so, whether implementation of

---

7. Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding on this court. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

the Agreement is precluded pending preparation of an EIS.[8] As regards the first issue, the fact that the actions designed to restore the Everglades are to be undertaken by the state agencies is not dispositive. The case law is quite clear that federal involvement in state or private activity may be sufficient to federalize the activity for purposes of NEPA.

Cases in which courts have found major federal action in otherwise nonfederal projects generally involve discretionary decisionmaking by federal agencies which permit or enable nonfederal actors to undertake activity affecting the environment. Typical examples include situations in which federal approval—usually in the form of a lease, permit, or license—is required, or where substantial federal funding is involved. *See, e.g., Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986) (county highway project involved federal action inasmuch as county needed a permit from the Army Corps to dredge a wetlands and highway crossed a state park purchased with federal funds, thereby requiring the Interior Secretary's approval for conversion of the park to other than recreational use); *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 152–54 (D.C.Cir.1985) (enjoining university genetic experiment approved and funded by the National Institutes of Health without compliance with NEPA); *Homeowners Emergency Life Protection Comm. v. Lynn,* 541 F.2d 814, 817 (9th Cir. 1976) (per curiam) (grant of federal funds transformed dam and reservoir project into a federal-city partnership, rendering project a major federal action); *Davis v. Morton,* 469 F.2d 593, 596 (10th Cir.1972) (Interior Secretary required to file an EIS prior to approving lease of Indian lands to private developer); *Greenpeace U.S.A. v. Evans,* 688 F.Supp. 579 (W.D.Wash.1987) (federal agency's granting of permit allowing scientists to collect skin and blubber samples from killer whales was subject to NEPA's requirement of EIS or preliminary environmental assessment). Other examples involve the provision of federal services or non-financial assistance to a nonfederal project. *See Sierra Club v. Hodel,* 544 F.2d 1036, 1044 (9th Cir.1976) (by entering into contract to supply power and construct transmission line to ALCOA plant, federal agency so federalized the project that it became major federal action); *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079 (D.C.Cir. 1973) (Atomic Energy Commission's development of technology enabling utility companies to construct nuclear power plants required an EIS).

Although each of the above cases highlights the presence of a federal decision which in some manner "enables" another to take action impacting upon the environment, the common theme underlying findings of federal action is the existence of federal responsibility for the activity in question. *See* CEQ regulations, 40 C.F.R. § 1508.18, defining "major federal action" as including effects "which are potentially subject to federal control and responsibility." Such responsibility may be found where a federal agency wields significant influence over a nonfederal project or where, even absent such influence, federal participation is nonetheless substantial. *See Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Regional Comm'n,* 599 F.2d 1333, 1347 (5th Cir.1979) (framing the issue as "whether there is sufficient federal control over, responsibility for, or involvement with an action to require preparation of an EIS"). A case which illustrates this larger theme is *Scottsdale Mall v. Indiana,* 549 F.2d 484 (7th Cir.1977), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978). *Scottsdale Mall* involved a highway construction project undertaken by the State of Indiana, which initially received federal funding for the project but subsequently withdrew from federal funding consideration in order to avoid compliance with NEPA. The court nonetheless required preparation of an EIS. Although finding that Indiana's receipt of early federal approval and financial aid rendered its highway project federal in char-

---

**8.** The Justice Department's internal regulations exclude the submission of consent or settlement agreements from its definition of "major federal action." 28 C.F.R. § 61.4. This rule, however, is not applicable because defendant-intervenors' NEPA argument is not directed toward the act of submitting the Agreement, but rather at the specific remedial actions set forth within the Agreement.

acter, despite its subsequent withdrawal from the funding program, the court also found "major federal action" in the federal government's extensive involvement in the project's planning. The record revealed federal participation in the programming, location, design, preliminary engineering, and right of way acquisition for the project. *Id.* at 489. Such extensive federal involvement was sufficient to federalize the state's highway, thus triggering the need for an EIS.

■ Application of the concept of federal "responsibility" to the case at hand yields the inevitable conclusion that the Everglades restoration project contemplated by the Agreement constitutes major federal action. The United States' responsibility for the Agreement's remedial measures is evident from the fact that these provisions were arrived at in consultation and negotiation with the United States. Through the negotiating process, the United States no doubt exercised considerable influence over determination of the precise interim and long-term phosphorous concentration limits established for the Park and Refuge, the interim and long-term target reductions in phosphorous loads from the EAA, and the size and location of the various STAs, all of which will surely have a significant impact on the environment.[9] Further, the United States will continue to exert control through the Agreement's dispute resolution mechanism. Pursuant to this provision, the state agencies are obligated to seek the approval of the United States before deviating from the terms of the Agreement. The United States thus not only had the power to influence the initial determination of the specific standards and measures affecting the environment, but also has the continuing power to set new or different standards by consenting to such changes. This is the kind of discretionary authority to approve or disapprove of actions affecting the environment

that is at the very heart what constitutes "major federal action." In addition to this more substantive influence, the United States will cooperate and participate in the Agreement's implementation by assisting the state agencies in research and monitoring as well as in their efforts in the state administrative process.[10] Given the extent of the United States' role both in shaping the Agreement and in its implementation, the Court finds that the Agreement's remedial measures constitute major federal action and will accordingly require preparation of an EIS.

■ The Court will not, however, require an EIS as a condition to its approval or the parties' implementation of the Agreement. Though mindful that an EIS is supposed to precede an agency's decision to move forward on action which affects the environment, the Court is no less cognizant of NEPA's original purpose, which is to promote preservation and enhancement of the environment. *See* 42 U.S.C. § 4331. Here, the United States is attempting to protect and save the Everglades from further deterioration, thus fulfilling NEPA's purpose. Defendant-intervenors, moreover, have alleged no harm or even possible harm to the environment which would occur as a result of the restoration project. Rather, they are trying to use an environmental law as a means of stalling an environmentally protective measure.

The irony of the situation confronting this Court is similar to that faced by the Sixth Circuit in *Pacific Legal Foundation v. Andrus,* 657 F.2d 829 (6th Cir.1981). There, a legal foundation and several residents of the State of Tennessee argued that the Secretary of the Interior violated NEPA by failing to file an EIS prior to listing several species of mussels as endangered under the Endan-

---

9. Although the United States' role in determining the size and location of the STAs implicates NEPA's requirements, the acquisition of land on which the STAs are to be constructed does not. It is the STAs, and not the mere acquisition of land, that affect the environment. *See City of Oak Creek v. Milwaukee Metro. Sewerage Dist.,* 576 F.Supp. 482, 488–90 (E.D.Wis.1983) (holding NEPA inapplicable to site-acquisition activities).

10. *Agreement* ¶¶ 13.B, 17, 18. *See also DER's and District's reply brief,* at 32, describing the Agreement as "a new spirit of cooperation between the state and federal governmental agencies who have bound themselves to work together in a cooperative effort to preserve and protect the Everglades ..."

gered Species Act. The designation of the mussels as endangered species had necessitated a halt in construction of a dam. Although the court, in rejecting the NEPA claim, rested its holding on a finding of statutory conflict between NEPA and the Endangered Species Act, it also made a pertinent observation about the use of NEPA as a device to frustrate actions intended to benefit the environment:

> The Secretary, by listing species, is working to preserve the environment and prevent the irretrievable loss of a natural resource. The Secretary thereby enhances the ability to learn about ecosystems and acts as a responsible trustee of the environment. One of the rationales for exempting the actions of the EPA under the Clean Air Act from NEPA was that the EPA was working to preserve and enhance the environment and thus served the purposes of NEPA. To require EPA to file an impact statement would only hinder its efforts at attaining the goal of improving the environment.
>
> ... This Court is reluctant to make NEPA more of an obstructionist tactic to prevent environment-enhancing action than it may already have become.

*Id.* at 837–38 (footnote omitted).[11]

Like the Sixth Circuit, this Court also declines to permit NEPA to be used as a litigation tactic to delay action intended to prevent "the irretrievable loss of a natural resource"—in this case, a resource with the unfortunate distinction as the most threatened park in the National Park system. To allow the Everglades to slowly strangle while a time-consuming EIS is being prepared would be inconsistent with NEPA's intent. "[A]n action which seeks to protect the environment from further deterioration deserves refuge from ... undue delay." *United States v. South Florida Water Management Dist.*, 922 F.2d at 712 (quoting *Manasota–88 v. Tidwell*, 896 F.2d 1318, 1323 (11th Cir. 1990)).

Finally, the Court notes that an EIS will not be useless. The restoration project spans a period of about eleven years, with interim concentration levels not expected to be reached until the year 1997 and long-term concentration levels set for the year 2002. It is therefore likely that an EIS will have been completed prior to occurrence of at least some of the project's environmental effects. If actions affecting the environment occur prior to completion of an EIS, the EIS will nevertheless serve the useful function of allowing the agencies to determine, at a much earlier date than would be the case if there were no impact statement, whether the effects are as anticipated and, if not, whether any corrective measures are in order. This decision, of course, rests entirely with the responsible agencies involved. NEPA mandates a process, not a result. *Methow Valley*, 490 U.S. at 350, 109 S.Ct. at 1846.

The Court recognizes that its decision to allow the Everglades project to proceed while simultaneously requiring an EIS is somewhat unusual, the typical remedy for a NEPA violation being maintenance of the status quo pending an environmental assessment or preparation of an EIS. It is the Court's view, however, that under the circumstances presented, the result reached

11. The court's mention of the EPA's exemption from NEPA's provisions is a reference to the "functional equivalent" test, a judicially created doctrine which exempts from NEPA's requirements actions of environmental agencies whose organic legislation mandates specific procedures for consideration of the environment that supply the "functional equivalent" of an impact statement. *See Alabama ex rel. Siegelman v. EPA*, 911 F.2d 499, 504–05 (11th Cir.1990); *Wyoming v. Hathaway*, 525 F.2d 66, 72–73 (10th Cir.1975); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 380 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Environmental Defense Fund v. EPA*, 489 F.2d 1247, 1256 (D.C.Cir.1973); *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 174 (6th Cir.1973); *Appalachian Power Co. v. EPA*, 477 F.2d 495, 508 (4th Cir. 1973).

In this case, the "functional equivalent" doctrine is not available to the United States because the Justice Department is not an environmental agency and is not operating under any enabling legislation which would provide the functional equivalent of an EIS. *See Texas Comm. on Natural Resources v. Bergland*, 573 F.2d 201, 208 (5th Cir.) (declining to apply the functional equivalent exception to Forest Service's clearcutting, stating that the doctrine is generally limited to agencies whose sole responsibility is to protect the environment), *cert. denied*, 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978).

herein "strike[s] a workable balance between some of the advantages and disadvantages of full application of NEPA." *Portland Cement,* 486 F.2d at 386.[12]

## III. CONCLUSION

The Court finds the Agreement to be fair, reasonable, and consistent with the public interest. This conclusion arises from the fundamental fact that the Agreement does no more than set in motion a process which itself is eminently fair and reasonable. In essence, the Agreement effects a transfer of these proceedings to a state administrative forum; this is precisely the result which the Farm Interests, at least, have consistently sought. Though defendant-intervenors would prefer that the Court relinquish its continuing jurisdiction over this case by leaving the ultimate determination of the United States' rights and remedies to the state administrative process, the Court declines to do so. The United States, having the right to be in this Court, has the right to return to this Court if it is not satisfied with its remedies in the administrative process.

The important point is that the Agreement's remedial terms cannot take effect without first being tested by defendant-intervenors and subject to careful and searching scrutiny in the state administrative process and perhaps again in this Court. The Agreement's fairness, in short, lies in the fair and impartial administrative and judicial processes to which its terms are necessarily subject. The Cities and Farm Interests, as potentially affected parties, are entitled to no more and no less.

I have difficulty understanding the amount of time, effort, and litigation spawned by an understandable effort to seek the truth and, if the truth requires, take the steps necessary to save a precious resource. The time has come, indeed, has passed, when the admitted problems facing the Everglades must be addressed. And yet the solutions must be the product of a meaningful search for the scientific truth. The original parties to this litigation conclude that they have found the answers or, at least, are aimed in the right direction. The Cities and the Farm Interests wish to participate in the finality of these conclusions and so they shall.

Lest there be any doubt from what has been said before in this Order, it is the Court's hope and expectation that the administrative process in which defendant-intervenors will be involved will be totally uninhibited by this Order and the Agreement to which it makes reference. If, ultimately, it is determined factually that procedures and methods other than those agreed to by the original parties herein should be undertaken, then it will lie with those parties to either accept those conclusions or seek further relief from the Court.

The Court accordingly approves the Agreement and ORDERS AND ADJUDGES as follows:

1. The Court has jurisdiction over this action. The Agreement is approved by the Court and by reference made a part of this Order. The parties to this Agreement are ordered to comply with its terms.

2. The Court shall retain jurisdiction over this matter for the purpose of enabling any of the Parties to the Agreement to apply to the Court at any time for such further orders or directives as may be necessary or appropriate for enforcement or modification of the terms of the Agreement.

DONE AND ORDERED.

---

12. The Court is aware of no case in which an action to *restore* an environmental resource was enjoined due to noncompliance with NEPA. The Eleventh and Fifth Circuit cases referred to at the outset, in which it was stated that NEPA is also concerned with beneficial impacts, involved proposals to mitigate a project's adverse environmental effects. *National Wildlife Federation,* 721 F.2d at 782–84; *Environmental Defense Fund,* 651 F.2d at 993. Because the mitigation plans were adopted to allay environmental concerns about a project's potential negative effect on the environment, it made sense to enjoin further project development until the beneficial or remedial effects of the plans were clearly established in an EIS.