UNITED STATES of America, Plaintiff–Counterclaim Defendant–Appellee–Cross–Appellant,

Florida Keys Citizen Coalition, Florida Audubon Society, Florida Wildlife Federation, Environmental Defense Fund, Sierra Club, National Wildlife Federation, Wilderness Society, National Parks & Conservation Association, Defenders of Wildlife and Treasure Coast Environmental Coalition, Miccosukee Tribe of Indians of Florida, Intervenor Plaintiffs–Appellees,

v.

SOUTHERN FLORIDA WATER MANAGEMENT DISTRICT and Florida Department of Environmental Regulation, Tilford Creel, Defendants–Counterclaim Plaintiffs–Appellees,

Carol Browner, Defendant–Appellee,

City of Belle Glade, City of Clewiston, Intervenor–Defendants–Appellants–Cross–Appellees,

Western Palm Beach County Farm Bureau, Inc., Florida Sugar Cane League, Inc., Roth Farms, Inc. and K.W.B. Farms, Intervenor–Defendants–Counterclaim, Plaintiffs–Appellants–Cross–Appellees,

Florida Fruit & Vegetable Association, Intervenor–Defendant,

South Bay Growers, Inc., Movant,

Colonel Bruce A. Malson, et al., Counterclaim Defendants.

UNITED STATES of America, Plaintiff–Counterclaim Defendant–Appellant,

Florida Keys Citizen Coalition, Intervenor–Plaintiff–Appellee,

---

Florida Audubon Society, et al.,
Intervenor–Plaintiffs,

v.

SOUTH FLORIDA WATER MANAGE-
MENT DIVISION, Florida Department
of Environmental Regulation, Defen-
dants–Counterclaim     Plaintiffs–Appel-
lees,

Tilford Creel, et al., Defendants,

City of Belle Glade, City of Clewiston,
Intervenor–Defendants–Appellants,

West Palm Beach County Farm, Florida
Sugar Cane League, Inc., Roth Farms,
Inc. and K.W.B. Farms, Intervenor–De-
fendants–Counterclaim,   Plaintiffs–Ap-
pellants,

Florida Fruit & Vegetable Association,
Intervenor–Defendant,

South Bay Growers, Inc., Movant,

Colonel Bruce A. Malson, et al.,
Counterclaim Defendants.

Nos. 92–4314, 92–4831.

United States Court of Appeals,
Eleventh Circuit.

Aug. 23, 1994.

Robert P. Smith, Tallahassee, FL, for West Palm Beach, County Farm Bureau, Roth Farms, K.W.B. Farms.

Robert H. Blank, Karl E. Hall, Jr., Miami, FL, for City of Clewiston, City of Belle Glade.

William L. Earl, Osmer D. Batcheller, Judith S. Kavanugh, Miami, FL, for Florida Sugar Cane League.

David C. Shilton, Ellen J. Durkee, Appellate Section, Environment Div., Dept. of Justice, Washington, DC, Susan Hill Ponzoli, Miami, FL, for the U.S.

Robert G. Dreher, Sierra Club Legal Defense Fund, Washington, DC, David Guest, Sierra Club Legal Defense, Tallahassee, for FL, FAS, SC, NWF, FWF, DOW, ASOTE, WS, NPACA, TCEC, FKCC, EDF.

David A. Crowley, Robert G. Gough, Dept. of Env., Tallahassee, FL, for Florida Dept. of Environmental Regulation.

Paul L. Nettleton, R. Benjamine Reid, Miami, FL, Abner T. Cooper, West Palm Beach, FL, for South Florida Water Management.

Eric C. Christu, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., West Palm Beach, FL, Jerry C. Straus, Hobbs, Straus, Dean & Wilder, Washington, DC, for Miccosuskee Tribe.

Thomas W. Reese, St. Petersburg, FL, for Florida Keys Citizens Coalition, Inc.

Robert P. Smith, Tallahassee, FL, for WPB County Farm Bureau, Roth Farms and K.W.B. Farms.

Before BLACK, Circuit Judge, DYER, Senior Circuit Judge, and ALAIMO *, Senior District Judge.

DYER, Senior Circuit Judge:

The Intervenor defendants appeal an interlocutory order granting an injunction entered by the district court in its Order Entering Settlement Agreement as Consent Decree. They assert lack of jurisdiction and a host of other issues that exceed the scope of their limited right to intervene granted by the prior panel in this case. On the cross-appeal of the United States, the government appeals the judgment of the district court that an impact statement pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* (1970), is required. We affirm in part, reverse in part, and remand for further proceedings.

## I. JURISDICTION

*Standard of Review*

■ The question of jurisdiction requires this court to satisfy itself not only of its own jurisdiction but also of the jurisdiction of the district court. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541–42, 106 S.Ct. 1326, 1331–32, 89 L.Ed.2d 501 (1986).

*Basis of Appellate Jurisdiction*

This court has jurisdiction over this appeal pursuant to 28 U.S.C.A. § 1292(a)(1) (West Supp.1992), which grants circuit courts juris-

---

* Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation.

diction over interlocutory orders of district courts in granting, continuing, modifying, refusing or dissolving injunctions. Although interlocutory in nature, the Consent Decree is effectively dispositive of all claims below.

### Order on Appeal

The Consent Decree approves a Settlement Agreement executed by two State agencies, the South Florida Water Management District ("SFWMD"), the Florida Department of Environmental Regulation ("DER"), and the United States. The Intervenor defendants, City of Belle Glade, City of Clewiston, Western Palm Beach County Farm Bureau, Inc., Florida Sugar Cane League, Inc., Roth Farms, Inc., KWB Farms and the Florida Fruit & Vegetable Association (hereinafter collectively referred to as the "Intervenors") are not parties to the Settlement Agreement.

### Intervening Legislative Act

During the pendency of this appeal, the *Everglades Forever Act*, chapter 94–115, to be codified at section 373.4592, Florida Statutes (Supp.1994), was passed by the Florida legislature on April 15, 1994, and became effective when signed by the Governor on May 3, 1994.

### Issues Presented

The issue on the Intervenors' appeal is limited to the question of whether the district court or this court has Article III case or controversy jurisdiction of the United States' claim of rights and remedy pursuant to 28 U.S.C. §§ 1331 and 1345. The Intervenors have raised issues on this appeal that exceed the scope of their limited right to intervene granted by this Court in *United States v. S. Fla. Water Management Dist.*, 922 F.2d 704, 706 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 407, 116 L.Ed.2d 356 (1991). In both their briefs and at oral argument the

Intervenors evidenced no appreciation for the limited extent of their participation in this litigation. The Intervenors' sole right is to raise jurisdiction as an issue with respect to Count 1 of the complaint.[1] This Court previously held that the Intervenors had the right to intervene "solely by reason of the issues raised in Count 1" of the complaint. *Id.* The grant of intervention was premised on the Court's concern that the United States sought in Count 1 to have the district court translate narrative water quality standards into numeric limits. *Id.* at ——–——, 112 S.Ct. at 708–09. In the initial appeal, it was not even clear that the United States' complaint sought to have the district court set a numeric standard. *See id.* at —— n. 6, 112 S.Ct. at 708 n. 6 ("In fairness to the District Court, we note that the United States claimed in that forum that it was *not* seeking a numeric standard" (emphasis added)). Thus, our prior opinion clearly limits the Intervenors' right to intervene solely to the extent that the district court's resolution of this case might actually set a numeric standard. But the district court did not set such limits in resolving the case. Instead, the United States and the State defendants settled their differences by agreeing to return the setting of numeric limits to the State administrative forum.

By arguing the many issues in which the Intervenors lack standing, they have required this Court to expend much time and effort which was entirely unnecessary.

### The Everglades and the Refuge

The Everglades is a limestone depression filled with grass and thick organic deposits from a broad southbound sheet of water. There are some 14 miles of canals and levees, dikes, pumps and water storage areas. This water system artificially transports water throughout the Kissimmee, Okeechobee and Everglades basins. Vast quantities of waters

---

1. The Intervenors attempt to argue that: (1) they were denied due process; (2) the Attorney General lacked independent authority to bring the claims without the consent of the responsible contracting agencies; (3) the court's exercise of jurisdiction violated fundamental principles of abstention, comity and federalism; (4) the Settlement Agreement violates the Florida Sunshine Law; (5) the Settlement Agreement exceeds the scope of the proceedings; (6) the Agreement violates the Flood Control Act; (7) the Agreement violates the Farmland Protection Policy Act. The Intervenors lack standing to raise these issues because they are outside of the limited scope of the intervention that was permitted by this Court.

are delivered to the Loxahatchee National Wildlife Refuge and the Everglades National Park. One of the largest consumers of water south of Lake Okeechobee is the agri-industry located within a 700,000 acre basin called the Everglades Agricultural Area ("EAA"). The EAA lies south of Lake Okeechobee between the lake and the water conservation area. The Park provides sanctuary to rare, threatened and endangered species of wildlife. The Park has diverse and complex ecosystems that require non-polluted, low nutrient waters for their ecological integrity.

The Refuge is a remnant of the original Northern Everglades, and has the same diversity of marsh habitat. It is also a sanctuary to unique wildlife species. Low nutrient waters are also required in the Refuge to preserve its native habitat.

Large quantities of polluted waters have resulted in the destruction of lower forms of aquatic life essential to the preservation of the sensitive ecosystems in the Park and Refuge.

### Procedural History

Count 1 of the government's complaint alleges that both DER and SFWMD have failed to exercise their power and responsibilities and failed to enforce State water laws in (a) regulating polluted water from the EAA that contain harmful nutrients, (b) failing to prevent violations of State water quality standards for water entering the Park and Refuge, and (c) having deliberately and consistently diverted polluted waters into the Refuge.

Count 2 alleges that SFWMD has violated State statutory and common law by operating unpermitted structures.

Count 3 alleges that SFWMD breached a contract with the United States Corps of Engineers which sets forth water quality standards for deliveries to the Park to insure that surface waters are of sufficient purity to prevent ecological damage to the Park.

Count 4 alleges that SFWMD breached a 50–year contract with the United States under which it was agreed that the Service should use the property there delineated as a

wildlife management area to promote the conservation of wildlife, fish and game.

The relief prayed for by the government is, *inter alia,* that DER and SFWMD be mandated to carry out their statutory duties to enforce all applicable water quality standards in waters diverted to the Park and Refuge, and to act within their authority to insure that the waters delivered to the Park and Refuge conform to the requirements of the 1984 and 1951 contracts.

The defendants DER and SFWMD denied that the district court has federal question jurisdiction under 28 U.S.C. § 1331 or subject matter jurisdiction under section 1345; that there is no case or controversy under Article III of the Constitution; nor is there any federal statute authorizing such action, or a Florida statute under which the State agencies have clearly consented to the suit. The defendants also asserted that the State's administrative remedies provide an adequate remedy at law.

After years of lengthy, complex, and acrimonious litigation, the United States, DER and SFWMD resolved all of their respective claims against each other by entering into a Settlement Agreement which the district court approved and entered as a Consent Decree. In a lengthy Memorandum Opinion and Order, *United States v. S. Fla. Water Management Dist.,* 847 F.Supp. 1567 (S.D.Fla.1992), the district court exhaustively reviewed and then approved the terms of the Agreement as fair, adequate and reasonable. The Agreement is not self-executing in that its provisions are to be carried out in accordance with Florida law and procedures.

### DISCUSSION

The decisive issue on this appeal is whether the district court has jurisdiction to entertain this action.

The Intervenors attack as fundamental error in the entry of the Consent Decree the court's lack of jurisdiction. The district court held it had jurisdiction of this action primarily because 28 U.S.C. § 1345 unequivocally grants jurisdiction without regard to the subject matter of the litigation. The

Intervenors challenge the court's jurisdiction, arguing that there is no case or controversy.

### 28 U.S.C. § 1345—Subject Matter Jurisdiction

The district court held that:

[t]he Court's jurisdiction over this case is predicated primarily, though not exclusively, upon 28 U.S.C. § 1345: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

The district court went on to say:

Under § 1345, the mere presence of the United States as a plaintiff in this case is enough to vest this Court with jurisdiction absent Congressional authority clearly indicating otherwise.

\* \* \* \* \* \*

It is also evident from the statutory language that ... a clear Act of Congress is required to *divest* district courts of their jurisdiction over actions commenced by the United States. The phrase 'Except as otherwise provided by Act of Congress,' at the beginning of the section was inserted to make clear that jurisdiction exists generally in district courts in the absence of special provisions conferring it elsewhere.

*S. Fla. Water Management Dist.*, 847 F.Supp. 1567 (S.D.Fla.) (emphasis in the original).

The Intervenors concede, as they must, that there is no subject matter bar as such to United States' suits against the States. *See United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972); *United States v. California*, 328 F.2d 729, 732 (9th Cir.), *cert. denied*, 379 U.S. 817, 85 S.Ct. 34, 13 L.Ed.2d 29 (1964); *United States v. Puerto Rico*, 551 F.Supp. 864, 865 (D.P.R.1982), *aff'd*, 721 F.2d 832 (1st Cir.1983); 14 Charles A. Wright et al., *Federal Practice and Procedure* § 3651 (1985). The Intervenors submit, however, that Section 1345 "simply assigns to the district court, it does nothing to create or define the jurisdiction created by Article III." We disagree.

■ When there is justiciability, the United States may, under section 1345, sue in the federal court irrespective of subject matter. In the seminal case of *Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968), the Supreme Court defined "case or controversy" as used in Article III of the Constitution:

Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of the federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part, those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to other branches of government. Justiciability is the term of art employed to give expression to the dual limitation placed upon federal courts by the case-and-controversy doctrine.

We explore the application of this doctrine to this case.

### Case or Controversy

Preliminarily, to define the issues in Count 1, it is important to consider what the district court did and what it did not do. This is because the thrust of the Intervenors' argument is that this is simply "litigation to coerce the making of State regulations that a federal judge deems suitable under State law for United States' property interests." We do not accept this as a correct statement of the issue involved. Rather, as the district court explained: "Nothing in this Agreement is intended to abrogate the District's and DER's duties to act in accordance with Florida law. Indeed, the Agreement requires the District and DER to fulfill their obligations under existing state law." 847 F.Supp. at 1572. The district court concluded that "[t]he Agreement does no more than set in motion a process.... The Agreement effects a transfer of these proceedings to a state administrative forum." *Id.* at 1582.

The government's amended complaint did not seek, nor does the Consent Decree provide, that the government's role is to force the State to compose or enforce stricter State law regulations. On the contrary, the Agreement commits the State to perform certain remedial measures which are fully authorized by State law. The essence of the Agreement is to achieve compliance with State law.

This background dictates that the narrow issue before us is whether the district court has jurisdiction of this suit brought by the United States, as a proprietary owner of the Park and Refuge, to protect its property from the nutrient pollution emanating from the EAA, by requiring the State agencies to carry out their State statutory duties to enforce the applicable water quality standards in waters diverted to the Park and Refuge.

Focusing on Article III, Section 2, of the Constitution which extends the federal judicial power to "controversies to which the United States shall be a party," the Intervenors argue that the settling parties are free to enter into any agreement that they may choose, but the district court may not enter such an agreement as a consent decree unless it is founded upon a federal statute or constitutional right.

To support this position, the Intervenors rely on restrictions on federal suits against states based on the powers granted to Congress and the residual state powers under the Tenth Amendment. They point to cases which strike down as unconstitutional an intrusion by Congress into the lawmaking functions of the states, and argue by analogy that the same principles apply to Article III jurisdiction. *See New York v. United States,* — U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (under the Tenth Amendment Congress may not compel the states to enact or administer a federal regulatory program); *Gregory v. Ashcroft,* 501 U.S. 452, 460–66, 111 S.Ct. 2395, 2401–03, 115 L.Ed.2d 410 (1991) (requiring "plain statement" in acts of Congress to override state decisions); *Will v. Mich. Dept. of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) (requirement of a clear statement in legislation with intent to affect the federal balance);

*Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (category of "traditional governmental function" is untenable standard for judicial decisions regarding state immunity under the Commerce Clause).

Intervenors submit that *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) condemns a federal court in instructing state officials on how to conform their conduct to state law. We observe that the court was there called upon to determine whether the claim against the petitioners in carrying out their official duties *violated* state law and, therefore, is a claim against the state barred by the Eleventh Amendment. There is no suggestion in the case *sub judice* that the Consent Decree *violates* state law. On the contrary, its object was to require adherence to state law.

Next, the Intervenors draw our attention to *Kasper v. Bd. of Elections Comm'rs of City of Chicago,* 814 F.2d 332 (7th Cir.1987), where the court quoted *Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911: "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." 814 F.2d at 342. Intervenors extrapolate this language as being applicable to this case. We find it to be clearly out of context. The court made it crystal clear in *Kasper* that "[t]he Republican plaintiffs' complaint contends that the Board has neglected its duties under state law. Yet, the decree does not stop with perfecting the Board's adherence to state law and exercising such discretion as the Board possesses. It commits the Board to *violate* state law." *Id.* at 341 (emphasis in the original). There is not a whisper of a suggestion that in this case the government is attempting to require the State to violate the law.

The Intervenors concede that the Tenth Amendment is not a limitation on Article III jurisdiction in this case, nor is it argued that the Eleventh Amendment has any applicability. We do not perceive how these cited decisions are helpful in determining whether there is a controversy question in this case.

Next, the Intervenors rely on cases in which citizens sue the federal or state sovereigns and the integrity of separated powers of reserved sovereignty is continually reaffirmed. They argue that these principles are not different when the United States sues a state. Such cases are *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). But these cases are bottomed on the plaintiff's lack of injury in not satisfying the "case or controversy" requirement. *Allen* held that in a citizen's suit the plaintiff must allege personal injury fairly traceable to the defendant's allegedly wrongful conduct. *Lyons* declared that to satisfy the "case or controversy" requirement of Article III, "the plaintiff must show that he 'has sustained, or is in immediate danger of sustaining, some direct injury' as a result of the challenged official conduct." 461 U.S. at 101–02, 103 S.Ct. at 1665. *O'Shea* was a citizens' civil rights suit "where none of the named plaintiffs ... [has] suffered any injury." 414 U.S. at 495, 94 S.Ct. at 676.

Here it is alleged with specificity the direct and continuing injury and damage to the ecosystems of the Park and Refuge because of nutrient water flowing from the EAA which could have been, and should be, prevented by the State agencies acting to enforce their own laws and regulations.

Intervenors next argue that *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) and *System Fed'n No. 91 v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) demonstrate the inappropriateness of the Consent Decree. We find these cases inapposite. *Firefighters* was a Title VII case concerned with an injunction entered outside of the scope of the consent decree. *System Fed'n* was concerned with a change of statutory law that was in conflict with the terms of the consent decree. The court there held that it must be free to modify the terms of the consent decree where a change in the law brings those terms in conflict with statutory law. 364 U.S. at 651–53, 81 S.Ct. at 373–74.

Finally, the Intervenors insist that there is no case or controversy in the district court because the action is not based on a constitutional right or a federal statute. We have found no authority to support this broad statement. On the contrary, in *United States v. California,* 328 F.2d 729 (9th Cir. 1964), the court stated that "the Constitution grants ... jurisdiction ... over civil suits brought by the United States against a State without specific consent regardless of the nature of the controversy, provided the issue is justiciable...." *Id.* at 731. The court pointed out in *United States v. Hill,* 694 F.2d 258 (D.C.Cir.1982) that "[a]lthough other special jurisdictional provisions may also give the district court jurisdiction over some cases brought by the United States, the government *need not have any specific statutory authorization for a particular action* inasmuch as general jurisdiction is conferred by Section 1345." *Id.* at 268 (emphasis in original). Again, in *United States v. Marchetti,* 466 F.2d 1309 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), the court held that jurisdiction arises from the United States as a party. "The government can sue even if there is no specific authorization. In such cases, however, it must have some interest to be vindicated sufficient to give it standing." *Id.* at 1313.

In 14 *Charles A. Wright et al., Federal Practice and Procedure* § 3651 (1985), the authors state:

> [T]he government need not have specific statutory authorization for a particular action inasmuch as general jurisdiction is conferred by Section 1345.... [W]hen the United States is not suing to vindicate a specific federal statutory right but simply bringing suit under the general jurisdictional provision in Section 1345, it has been held that it must have an interest in the dispute that is sufficient to give it standing.... The government's interest need not be pecuniary or proprietary; it simply may decide to litigate to assure the proper implementation of its policies and programs.

We conclude that this action does present a case or controversy. The justiciability of the controversy rests on the govern-

ment's assertion that the use of its public lands is being destroyed by nutrient-laden water because the State agencies are not fulfilling their legislatively enacted duties. Nor does it intrude, in the circumstances of this case, into areas reserved by the sovereignty of the State.

## II. NATIONAL ENVIRONMENTAL POLICY ACT

The United States appeals the judgment of the district court that the federal government's participation in negotiating and implementing the Settlement Agreement, which requires State remedial action to be taken, is major federal action within the meaning of section 102 of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and, therefore, preparation of an Environmental Impact Statement ("EIS") is required, but not simultaneously with or as a condition to the implementation of the Settlement Agreement. We reverse.[2]

The underlying facts are set forth in the Intervenors' appeal.

### Standard of Review

█ The district court's findings of fact are reviewable for clear error. *See Newell v. Prudential Ins. Co. of Am.,* 904 F.2d 644, 649 (11th Cir.1990). Whether control is the sort that NEPA regards as significant for EIS purposes is a question of law subject to *de novo* review. *Sierra Club v. Hodel,* 848 F.2d 1068, 1089 (10th Cir.1988).

### Major Federal Action

In *Save Barton Creek Ass'n v. Fed. Highway Admin.,* 950 F.2d 1129 (5th Cir.1992), the court held that:

NEPA requires that federal agencies consider the environmental consequences of "major federal action significantly affecting the quality of the human environment". 42 U.S.C. § 4332(a)(C). The requirements of NEPA, which include, among other things, the submission of an EIS, apply only when the federal government's in-

volvement in a project is sufficient to constitute "major federal action".

950 F.2d at 1133 (footnote omitted).

We must therefore determine whether, at this juncture, sufficient federal involvement exists in what is proposed in the Settlement Agreement to constitute major federal action affecting the environment under NEPA.

█ The focus in this case is on the federal agencies' control and responsibility over material aspects of the specific project. *See, e.g., Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042–43 (4th Cir.1986) (exercise of federal approval power over state project). Major federal action can exist when the primary actors are not federal agencies. *Macht v. Skinner,* 916 F.2d 13 (D.C.Cir.1990); *Save Barton Creek Ass'n,* 950 F.2d at 1133. There are no clear standards for defining the point at which federal participation transforms a state project into federal action. "Federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA." *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1480 (10th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). The touchstone of major federal activity constitutes a federal agency's authority to influence nonfederal activity. "[T]he federal agency must possess actual power to control the nonfederal activity." *Sierra Club,* 848 F.2d at 1089.

█ The fact that proposals have been made as the result of a state-federal compromise agreement to compel a nonfederal party to undertake its legal responsibility does not convert the proposed state remedial measures into federal responsibilities for NEPA purposes. The power to influence the outcome of a lawsuit by advocacy and negotiation is not synonymous with a federal agency's authority to exercise control over a nonfederal project which requires federal approval as a legal precondition to implementation. We must bear in mind that the district court properly found that the Agreement

---

**2.** This appeal by the United States, No. 92–4831, is consolidated with Intervenors' appeal, No. 92– 4314.

requires the agencies to fulfill their obligations under State law by setting in motion a process to effect a transfer of the proceedings to a State administrative forum. The rendering of advice and technical consultation to aid in the defense of the Settlement Agreement in legal proceedings does not significantly affect the environment and does not federalize the State activities. The possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely. *Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n*, 599 F.2d 1333, 1347 (5th Cir.1979).

The district court concluded that the State's restoration program is federalized by three factors: (1) the influence exercised by the United States through the settlement negotiations and remedial measures proposed in the Settlement Agreement; (2) the United States' participation in research and monitoring and the administrative actions contemplated by the Agreement; and (3) the United States' continuing power to withhold consent and invoke dispute resolution mechanisms concerning the State agencies' restoration program decisions.

As we have previously discussed at some length, the first two of the three factors relied on by the district court in finding that the State's restoration program is federalized under the Settlement Agreement are insufficient for purposes of NEPA. In sum, the federal government does not possess the requisite control to federalize a project when the state agencies retain their state law authority to make the decisions concerning the project. *See Village of Los Ranchos*, 906 F.2d at 1480–81.

NEPA applies only when there is federal decision-making, not merely federal involvement in nonfederal decision-making. The State agencies will implement the remedial program pursuant to existing authority under Florida law and in accordance with State statutory schedules and procedures.

The third factor relied upon by the district court is the United States' continuing power to withhold consent and invoke dispute resolution mechanisms. However, we read the retained jurisdiction provision of the district court to be limited to the parties to the Agreement without power to implicate third parties. Thus, jurisdiction is retained only for the purpose of insuring that there will be no unilateral action that would contravene the provisions of the Agreement and precipitate fresh litigation. This limitation provision does not provide the control necessary to presently treat the State agencies' remedial activity as major federal action.

The United States does not contend that NEPA obligations will never arise during the implementation of the remedial measures. The objection is to scope and timing. We agree. NEPA obligations may attach to specific activities which may be proposed as part of the State's implementation program. A federal agency may undertake a major federal action in the form of funding as a part of the restoration program, issuance of a permit or license to a State agency, or a change of operations over which the federal agency has authority.

It would be premature and serve no useful purpose to now require the preparation of an EIS when no specific federal action has been proposed. *See Environmental Defense Fund v. Marsh*, 651 F.2d 983, 999 (5th Cir. Unit A July 1981) (preparatory designs and studies not completed); *Kleppe v. Sierra Club*, 427 U.S. 390, 399–402, 96 S.Ct. 2718, 2725–27, 49 L.Ed.2d 576 (1976) (no factual predicate for EIS without a proposed plan). NEPA does not require evaluation of hypothetical proposals, impacts and alternatives concerning a nonexistent federal proposal. This would seem to be an impossible task. If and when such activities are actually proposed, the responsible agency will have to comply with NEPA requirements, and the question of whether an EIS is required will then be addressed. Now, none of these types of federal action has yet been performed.

## CONCLUSION

In the appeal of the Intervenors, No. 92–4314, the district court and this court have jurisdiction of the cause pursuant to the provisions of 28 U.S.C. §§ 1331 and 1345.

In view of the enactment of the Everglades Forever Act by the Florida legislature during the pendency of this appeal, we REMAND this cause to the district court for further consideration in the light of this legislation.

In the appeal of the United States, No. 92–4831, the United States is not required, at this time, to prepare an EIS under NEPA.