**THE FUND FOR ANIMALS, et al.**

v.

**Bruce BABBITT, et al.**

**No. Civ. 1:94CV301.**

United States District Court, D. Vermont.

Oct. 8, 1997.

Beth Robinson, Langrock, Sperry & Wool, Middlebury, VT, Kimberly K. Wally, Eric R. Glitzenstein, Washington, DC, for Plaintiffs.

Helen M. Toor, Asst. U.S. Atty., Office of U.S. Atty., Dist. Vt., Burlington, VT, for Defendants U.S., Dept. of Interior, Mollie Beattie.

John Wallace Malley, Jr., Vermont Atty. General's Office, Montpelier, VT, for Defendant Allen Elser.

Peter Welles Hall, Rodney Edward McPhee, Reiber, Kenlan, Schwiebert, Hall & Facey, Rutland, VT, William P. Horn, Douglas S. Burdin, Birch, Horton, Bittner and Cherot, Washington, DC, for Movants Reginald Rowell, William Ingalls, Kevin Ingalls, Wildlife Conservation Fund of America.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

(papers 57, 74 and 78)

MURTHA, Chief Judge.

The plaintiffs, which include several individuals and environmental groups, challenge the federal government's alleged failure to evaluate adequately the environmental consequences of Vermont's annual moose hunt as required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (hereinafter "NEPA"). Having completed adequate discovery on all outstanding issues [1], the parties have filed cross-motions for summary judgment. For the reasons set forth below, the Plaintiffs' Motion for Summary Judgment is DENIED, and the state and federal defendants' Motions for Summary Judgment are GRANTED.

### I. Background

Each party moving for summary judgment has an initial burden of informing the Court of the basis for its motion and of identifying

---

1. In their opposition to the state and federal defendants' motions for summary judgment, the plaintiffs suggest their need for further discovery renders this Court unable to grant the defendants' motions. *See generally* Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment (paper 79). However, at oral argument on September 23, 1997, the plaintiffs admitted they had conducted sufficient discovery.

those parts of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Latimer v. Smithkline and French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where a motion for summary judgment is supported by affidavits or other documentary evidence, the party opposing that motion must set forth specific facts which show there is a genuine, material issue for trial. *See King Service, Inc. v. Gulf Oil Corp.,* 834 F.2d 290, 295 (2d Cir.1987). Accordingly, for an opposing party to resist entry of summary judgment, it must come forward with enough evidence to support a verdict in its favor. It cannot defeat a properly supported motion merely by presenting metaphysical doubt, conjecture or surmise concerning the facts. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir. 1989). Only disputes over facts which might affect the outcome of the suit under the governing law preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This matter has been the subject of several opinions which discuss the statutory framework underlying this action and set forth the background of moose hunting in Vermont. *See generally Fund for Animals v. Babbitt,* 89 F.3d 128 (2d Cir.1996); *Fund for Animals v. Babbitt,* Opinion–Order, Civil No. 5:94CV301 (D.Vt. July 6, 1995)(paper 33) (Billings, J.); *Fund for Animals v. Babbitt,* Ruling on Plaintiffs' Motion for Preliminary Injunction, 2 F.Supp.2d 562 (D.Vt.1996) (paper 44) (Murtha, C.J.). Familiarity with these opinions is presumed.

In support of their motions for summary judgment, the parties have relied on many of the same documents before the Court when ruling on Plaintiffs' Motion for Preliminary Injunction. Upon review, the Court finds the material facts set forth in its October 4, 1996 Ruling on Plaintiffs' Motion for Preliminary Injunction remain undisputed and hereby incorporates those facts into the instant ruling. *See* Ruling on Plaintiffs' Motion for Preliminary Injunction at 2–7, 9–10. Furthermore, the record demonstrates the following additional material facts are undisputed. *See* Local Rule 7.1(c).

On or about June 15, 1993, the Vermont Department of Fish and Wildlife (hereinafter "VDFW") submitted to the United States Fish and Wildlife Service (hereinafter "FWS") an application pursuant to the Wildlife Restoration Act, 16 U.S.C. §§ 669–669i (hereinafter "WRA") for funding of its five-year Moose Investigations Project (hereinafter "the Project"). As originally conceived, the Project had several objectives, including:

> To more fully develop survey and sampling techniques and to maintain information sources that provide an index to: the population status and health of Vermont's moose; the level and nature of moose-based recreation; and, the level and nature of conflicts between human land use and moose.

> To gain public support for the moose management program by disseminating information on Vermont's moose population and moose management techniques.

*See* Memorandum in Support of Plaintiffs' Motion for Summary Judgment (paper 16) (hereinafter "Paper 16") at Exhibit 4 at 4.

The June 1993 Project proposal is a multi-page document divided into two "Studies." Study Number I is comprised of six "Jobs," each Job having a distinct title and objective. Study Number II has one additional "Job"; therefore, the Project contains a total of seven "Jobs." *See* Paper 16, Exhibit 4 at 3 *et seq.*

Project Study I, entitled "Population Dynamics, Physical Condition, and Human Interactions of Vermont Moose," provides as its objectives:

> (1) To determine the population dynamics and physical condition of Vermont moose on a continuing basis.

> (2) To maximize recreational benefits from Vermont's Moose within acceptable social and biological limits.

> (3) To minimize negative interactions between humans and moose.

Paper 16, Exhibit 4 at 3.

To further these broad objectives, Job 1 under Study I provides for "Administration

of a Legal Moose Harvest." Study I, Job 1 describes five procedures relating to administration of the moose hunt:

(1) Conduct periodic public information-gathering meetings in selected WMUs [Wildlife Management Units] to measure public desires and compatibility of the current moose density.

(2) Using population modeling techniques ... prepare any recommended harvest regulation necessary to provide benefits and moose densities, within prescribed limits, desired by local publics.

(3) Prepare and distribute moose hunting application forms and associated materials.

(4) Process applications received, conduct random lottery drawings of permittees, and notify successful applicants.

(5) Develop a mandatory hunting training workshop and conduct two such pre-hunt workshops annually, one in August for residents and one in October for replacements and non-residents.

Paper 16, Exhibit 4 at 6.

As discussed in the other rulings preceding this opinion, over the course of this litigation, the FWS has reexamined the Project and changed its decision to fund several of the job elements related to the moose hunt. Subsequent to the approval of the first grant proposal, FWS Wildlife Program Regional Chief John Organ realized he had mistakenly approved funding for elements (3) and (4). Thus, in the Spring of 1994, VDFW agreed that elements (3) and (4) would be removed from the Program Narrative. Moreover, the state reimbursed the federal government for federal funds expended on these two Job elements.

Accordingly, on or about June 20, 1994, the state submitted the revised Program Narrative which is currently in effect. *See* Paper 16 at Exhibit 14. The Program Narrative now defines its objective as follows:

To develop and/or maintain information sources that provide an index to: the population status and health of Vermont's moose; the level and nature of moose-based recreation; and, the level and nature of conflicts between human land use and moose; so that Vermont's moose can be managed to sustain viable populations consistent with biological, social, and economic considerations.

Paper 16, Exhibit 14 at 6.

Likewise, the procedures under Study I, Job 1 were revised as follows:

(1) Conduct periodic public information-gathering meetings in selected WMUs to measure public desires and compatibility of current moose density.

(2) Using population modeling techniques ..., prepare any recommended harvest regulation necessary to provide benefits and moose densities, within prescribed limits, desired by local publics.

(3) Develop a mandatory hunter training workshop and conduct two such pre-hunt workshops annually, one in August for residents and one in October for replacements and non-residents.

Paper 16, Exhibit 14 at 11.

Prior to the hunts in 1993, 1994 and 1995, the state conducted hunter training seminars to instruct prospective hunters on matters such as "shot placement and anatomy" of moose and "meat processing and preservation." *See, e.g.,* Plaintiffs Memorandum in Support of Motion for Summary Judgment (paper 58) (hereinafter "Paper 58") at Exhibit N (agenda for 1994 Moose Hunter's Pre-hunt Seminar). At each seminar, the state provided a brochure, produced in part with WRA funds, which sets forth detailed descriptions of moose anatomy and effective weapon aiming techniques. In addition, it provides instructions on field-dressing and quartering a moose and antler-mounting. *See* Paper 58 at Exhibit P.

As of 1996, the state ceased conducting hunter seminars in connection with the moose hunt. *See* Second Affidavit of Cedric Alexander (hereinafter "Alexander Affidavit") (appended to paper 74 as Exhibit 8) at para. 4. Thus, to the extent the plaintiffs' rely upon the funding of the hunter education seminars, their claim is moot.

However, the state has continued to distribute the aforementioned guide which includes, *inter alia*, information about moose shot placement, butchering, cooking, and trophy care. The plaintiffs object to partial

federal funding of this portion of the program.

The record is confusing on the issue of the amount of funding the federal government has provided for the particular activities to which the plaintiffs have objected. In its original proposal, the state estimated the five-year project would cost $220,960, of which the FWS would contribute 75%, or $165,720. *See* 16 U.S.C. § 669e(2). It further projected the total five-year cost of the original five elements related to the Job I, Study 1 administration of the moose hunt from 1993 through 1998 would be $50,880. As permitted under the WRA, the FWS would contribute 75% of this amount, while Vermont would fund the remaining 25%.

According to the plaintiffs, the actual total expenditures over the five-year Program period for Study I, Job 1 are $55,139, with the federal share amounting to $41,353, an amount slightly higher than the original estimate of $38,160. *See generally* Plaintiffs' Notice of Filing (paper 81)(summarizing expenditures as evidenced in the record). Nevertheless, it is clear that only a portion of the total federal funds provided under the WRA were used to fund the hunter education seminars and that even a smaller portion is used to produce the hunter education manual which the state still distributes.

The Moose Investigation Project at issue ends on June 30, 1998. On October 18–21, 1997, the final hunt will be conducted under the Project. The moose population in Vermont has continued to increase, despite the moose hunts which Vermont has conducted over the past four years as part of its Moose Investigations Project. *See* Alexander Affidavit at para. 2.

## II. Discussion

### A. Standing

The plaintiffs are The Fund for Animals, a national nonprofit organization, the Green Mountain Animal Defenders, a nonprofit organization representing over 600 Vermont families, Sherry Pyden, the owner of a bed and breakfast located in the Northeast Kingdom, and Bert and Bonnie Dodson, two Vermont residents. They allege various aesthetic, recreational and professional injuries as a result of Vermont's moose hunt.

The Second Circuit remanded the issue of the plaintiffs' standing for this Court's consideration. *See* 89 F.3d at 134. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish standing, the party invoking federal jurisdiction bears the burden of establishing the following elements:

First, the plaintiff[s] must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" .... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* (citations omitted).

As the *Lujan* Court further explained:

When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of

standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. . . . Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily "substantially more difficult" to establish.

*Id.* at 561–62, 112 S.Ct. 2130 (emphasis added; citations omitted).

 "[W]hen ruling on standing, a court must examine the substantive issues to discover whether there is a nexus between the alleged injury and the claim sought to be adjudicated in a federal court." *Matter of Appointment of Independent Counsel,* 766 F.2d 70, 75 (2d Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985). Having before it a more complete record than did either Judge Billings or the Second Circuit, the Court concludes the plaintiffs have no standing to bring this action.

The defendants and this Court assume the plaintiffs have met the injury-in-fact requirement. *See* 89 F.3d at 134; *see also Fund for Animals Inc. v. Espy,* 814 F.Supp. 142, 149–50 (D.D.C.1993). Nevertheless, the plaintiffs have failed to demonstrate causation or redressability.

This is the final year in the five year plan to which the plaintiffs object. It is undisputed that the state initiated its planned hunt prior to receiving federal funding and has been solely responsible for its oversight and administration. It is undisputed that, absent the federal funding at issue, the state is authorized to continue, and will continue, to conduct the moose hunt. Because the state consistently has indicated it will continue the moose hunt, it is mere speculation that a favorable decision by this Court will in any way redress the plaintiffs' alleged injuries.

Thus, any injuries the plaintiffs have suffered are attributable to the state's decision to organize the moose hunt, not to the failure of federal officials to comply with NEPA. In addition, it is noteworthy that this Court cannot afford the plaintiffs the primary relief they apparently seek, i.e., to stop the moose hunt. *See Lujan,* 504 U.S. at 571, 112 S.Ct. 2130 (Respondents had no standing where "it is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve."); *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1397 (9th Cir. 1992) ("State actors may not be enjoined under NEPA simply because a state project involves major federal action.") Even if the plaintiffs were to prevail on the merits, this Court would be required to remand this matter to the FWS for reconsideration of the applicability of the categorical exclusion. However, the history of this matter demonstrates the FWS already has reevaluated its applicability each time the state has made a new request for Project funding. To that extent, it appears the plaintiffs have received at least some of the relief they seek.

### B. Categorical Exclusion

 In its Ruling on Motion for Preliminary Injunction, the Court questioned whether the project at issue constituted a "major Federal action" requiring NEPA compliance. In support of their argument, the plaintiffs note that 40 C.F.R. § 1508.18(a) provides that actions subject to NEPA include "projects and programs entirely or partially financed . . . by federal agencies." Moreover, the FWS's Supplemental Environmental Impact Statement entitled "Federal Aid in Fish and Wildlife Restoration Program" provides:

All projects under the Program must be reviewed and approved by the Service prior to funding and this approval action by the Service is a Federal Action. Thus, the approval of each project must include the examination of potential environmental impacts associated with the project in accordance with the National Environmental Policy Act (NEPA) (40 CRF 1501). The state agencies are expected to carry out an environmental review of their projects and document this in their applications but the responsibility for NEPA compliance rests with the Service and cannot be delegated to the States submitting project funding requests.

*See* Paper 58, Exhibit R at 17, para. 2.5.1. Thus, funding of the program at issue is subject to NEPA.

When reviewing an administrative decision made under NEPA, the purpose is to ensure that the agency has considered the environmental consequences of its proposed action.... To conform with NEPA, a reviewing court need only find that the agency considered the environmental consequences of its proposed actions. An agency making a decision under this statute does not have to accord environmental concerns any more weight in the decision making process than other appropriate concerns. If an agency decides that the economic or social benefits of a project outweigh its environmental costs, its choice must be affirmed so long as the procedural requirements of NEPA were followed, that is, environmental consequences were considered.

*Sierra Club v. U.S. Army Corps of Engineers,* 772 F.2d 1043, 1050 (2d Cir.1985) (citations omitted).

■■■ "The agency determines the category covering its proposed actions." *City of New York v. Interstate Commerce Commission,* 4 F.3d 181, 183 (2d Cir.1993). Unless the Court finds the agency acted arbitrarily, its decision must be upheld. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); 5 U.S.C. § 706(2)(A).

The dispositive issue, therefore, is whether the government's determination that the funding at issue was subject to categorical exclusion is arbitrary and capricious. Under the applicable Council on Environmental Quality (hereinafter "CEQ") regulation,

"Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations ... and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.... Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.

Upon review of the VDFW's Grant Proposal, John Organ determined the project was "categorically excluded" from NEPA procedures. Specifically, he determined that the Proposal consisted of "non-destructive data collection, inventory ... study, research and monitoring activities: and '[p]ersonnel training, environmental interpretation, public safety efforts and other educational activities' " and did not fall within any exception to the categorical exclusions. *See* Affidavit of John F. Organ (appended to paper 74 as Exhibit 7) at para. 17.

As this Court observed in its Ruling on Plaintiffs' Motion for Preliminary Injunction, the WRA explicitly authorizes federal funding of state "[p]rojects having as their purpose the education of hunters and archers in the skills, knowledges, and attitudes necessary to be a responsible hunter or archer." 50 C.F.R. § 80.5(a); *see* 16 U.S.C. § 669g(b). The Federal Aid Handbook promulgated by the Department of the Interior describes as eligible for WRA funding hunter training programs "includ[ing], but not limited to, the safe and proficient use of hunting equipment, hunter responsibility, principles of wildlife management, wildlife identification, and, to the degree practical, a live firing experience." Federal Aid Manual (appended to paper 74 as Exhibits 1, 2 and 3) at Chapters 11, 12, 13. The Federal Aid Manual further defines as categorical exclusions programs which include "[p]ersonnel training, environmental interpretation, public safety efforts and other educational activities." *See* Organ Affidavit at para. 17.

■■■ Thus, under applicable regulations, Mr. Organ's conclusion that the topics covered in the brochure address hunter safety and education is rational. For example, education on proper shot placement is related to the alleviation of unnecessary animal suffering and to the safe and effective use of firearms. Likewise, carcass preparation education rationally relates to the prevention of disease, food-poisoning, and waste of resources. Because these topics relate to safe

and responsible hunting, Mr. Organ's application of the categorical exclusion must be upheld.

The plaintiffs also continue to suggest the state's activities are highly controversial and therefore cannot be categorically excluded. "Opposition and a high degree of controversy, however, are not synonymous." *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 39 (2d Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984). Despite the hunt, the moose population in Vermont continues to increase, albeit at a slower rate. Moreover, individuals are still able to view moose. Accordingly, any controversy generated is based upon speculation and does not support a conclusion that the government's determination of the applicability of the categorical exclusion was arbitrary and capricious.

The plaintiff's objection to the state's production of the hunter education brochure constitutes a small portion of the entire Project. It is difficult to ascertain how partial federal funding of the pamphlet at issue renders a hunt organized and run by the state sufficiently controversial so as to fall outside an otherwise applicable categorical exclusion. *See United States v. Southern Florida Water Management District,* 28 F.3d 1563, 1573 (11th Cir.1994), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995) ("NEPA applies only when there is federal decision-making, not merely federal involvement in nonfederal decision-making."); *Bradley v. U.S. Department of Housing and Urban Development,* 658 F.2d 290, 294 (5th Cir.1981) (Creation of a plan with federal block grant funds does not convert creation and adoption of a project into a "major Federal action."); *see also* 40 C.F.R. § 1508.27(CEQ regulations define "significantly" in terms of "context and intensity.") In short, the plaintiffs have failed to demonstrate extraordinary circumstances which removes this matter from the class of agency-predetermined activities which are categorically excluded from preparation of an EA or EIS. *See City of New York,* 4 F.3d at 185.

### III. Conclusion

The plaintiffs' Motion for Summary Judgment is DENIED. The government's and the state's Motions for Summary Judgment are GRANTED.

SO ORDERED.