625 So.2d 1263 (1993)
STUART YACHT CLUB & MARINA, Inc., Appellant,
v.
State of Florida, DEPARTMENT OF NATURAL RESOURCES, Appellee.
No. 92-2199.
District Court of Appeal of Florida, Fourth District.
October 6, 1993.
*1265 William E. Guy, Jr., Stuart, for appellant.
Kenneth J. Plante, Gen. Counsel, and M.B. Adelson IV, Asst. Gen. Counsel, Dept. of Natural Resources, Tallahassee, for appellee.
PER CURIAM.
Appellant, Stuart Yacht Club & Marina, Inc., appeals from a final order of the Division of Administrative Hearings upholding the validity of certain rule amendments to Chapter 16N-16, Florida Administrative Code, which were proposed by appellee, the Department of Natural Resources (DNR). We affirm in part, reverse in part, and remand for further proceedings.

FACTS
Stuart Yacht Club operates a full service marina located on the St. Lucie River in Stuart, Florida. The marina includes a fueling facility that includes two 10,000 gallon storage tanks, one holding gasoline and the other diesel fuel, as well as dispensers and associated equipment used for fueling vessels.
On March 6, 1992, DNR published notice in the Florida Administrative Weekly of, inter alia, proposed rules 16N-16.032, 16.033, and 16.034. In essence, these rules, which purport to implement sections 376.065 and 376.07, Florida Statutes (1991), would require a "terminal facility"[1] to: (1) obtain a spill prevention and response certificate from DNR; (2) prepare a spill contingency/prevention plan for reporting pollutant discharges (e.g., fuel spills) and detailing the methods, means, and equipment to be used to remove the spill; and (3) make available certain additional cleanup equipment which DNR deemed necessary to clean up a 10,000 gallon fuel spill.
Stuart Yacht Club timely filed a petition with the Division of Administrative Hearings pursuant to section 120.54(4) challenging the validity of the proposed rules on the grounds that they represented an invalid exercise of delegated legislative authority. Specifically, Stuart Yacht Club asserted the proposed rules were invalid because: (1) they enlarge, modify, or contravene DNR's grant of rulemaking authority; (2) they are arbitrary and capricious; and (3) DNR failed to follow applicable rulemaking procedures by neglecting to adequately address in its economic impact statement the economic impact of the proposed rules on small businesses.
After a hearing, the hearing officer issued an order which, among other things, found that proposed rules 16N-16.032, 16.033, and 16.034 are facially consistent with sections 376.065 and 376.07, and, therefore, are not an invalid exercise of delegated legislative authority.[2] In addition, although agreeing in substance with Stuart Yacht Club's contention that DNR's economic impact statement did not comply with section 120.54(2), which requires all agencies to consider the impact a proposed rule will have on "small business," the hearing officer nevertheless found the error to be harmless because those costs imposed on small businesses by the proposed rules were not shown to be unreasonable.

LAW AND ANALYSIS
As noted, the proposed rules at issue purport to implement sections 376.065 and 376.07, which are part of the Pollutant Spill Prevention and Control Act (Act). Section 376.07 grants DNR the authority to adopt and enforce reasonable rules relating to, among other things: (1) operation and inspection requirements for spill prevention, *1266 abatement and cleanup of terminal facilities and vessels; (2) procedures, methods, means and equipment to be used by terminal facilities in the removal of pollutants; (3) development and implementation of criteria and plans to meet a variety of pollution occurrences; and (4) such other rules as may be reasonably necessary to carry out the intent of the Act. Section 376.07(2)(a), (c), (d), & (i).
Section 376.065 provides in subsection (1) that every owner or operator of a terminal facility must obtain a spill prevention and response certificate from DNR. Section 376.065(2) requires each applicant for such a certificate to provide DNR with a list of information, including: (1) the length of the largest vessel docking at or providing service from the terminal facility; (2) all prevention, containment, and removal equipment; and (3) terms of any agreement of any discharge cleanup organization to which the terminal facility may belong. Then, section 376.065(3) states in relevant part:
No person shall operate or cause to be operated a terminal facility without access to minimum containment equipment measuring five times the length of the largest vessel docking at or the largest vessel providing service from the terminal facility, whichever is larger. The containment equipment shall be available to begin deployment on the water within 1 hour after discovery of a spill. Within a reasonable time period, additional cleanup equipment shall be available ... to reasonably clean up 10,000 gallons of pollutants, unless the terminal facility does not store or service vessels having the capacity to carry that quantity as fuel or cargo.

(Emphasis added). Finally, according to section 376.065(4), once DNR is satisfied that a terminal facility's containment and cleanup capability complies with section 376.065, DNR shall issue to that facility a spill prevention and response certificate.
Proposed rule 16.032, entitled "Terminal Facility Spill Prevention and Response Certificates; Inspections," permits DNR to: (1) gather the information listed in section 376.065; (2) verify that information; (3) inspect terminal facilities to verify access to the containment equipment required by that section; and (4) review and verify the contents of the terminal facility's contingency plan. This rule also defines what section 376.065(3) refers to as "a reasonable time" within which additional cleanup equipment shall be made available.
Proposed rule 16.033 requires an owner or operator of a terminal facility to have a spill contingency plan detailing the methods, means and equipment to be used in the removal of a pollutant in the event of a discharge. Seizing upon the language of section 376.065(3) emphasized above, subsections (1)(b) and (c) of the rule create a distinction between the contingency plan for terminal facilities "with a pollutant storage capacity of 10,000 gallons or greater," and those "with a pollutant storage capacity of less than 10,000 gallons." Only those terminal facilities falling in the former category bear the added burden of providing for a secondary cleanup response using "additional cleanup equipment."
Finally, proposed rule 16.034 simply details the "additional cleanup equipment" DNR determined was necessary to clean up a 10,000 gallon pollutant discharge, as required by section 376.065(3), and notes that a waiver or substitution of equipment may be requested.

10,000 GALLON STANDARD
Initially, Stuart Yacht Club contends the proposed rules described above are arbitrary and capricious because DNR gave no basis for relying on 10,000 gallons as the "cut-off" provided in 16.033 and 16.034. However, because the 10,000 gallon figure derives from the express language of section 376.065(3), its use in these rules is completely rational. Consequently, Stuart Yacht Club's argument lacks merit. See Agrico Chemical Co. v. State Dep't of Envtl. Regulation, 365 So.2d 759 (Fla. 1st DCA 1978), cert. denied, 376 So.2d 74 (Fla. 1979).
Next, Stuart Yacht Club contends the proposed rules represent an invalid exercise of delegated legislative authority because they enlarge, contravene or modify the specific provisions of law those rules purport to implement.

*1267 PROPOSED RULES 16.032 & 16.034

After closely reviewing proposed rules 16.032 and 16.034, we find there is nothing in those rules that is inconsistent with either the rulemaking authority granted DNR by section 376.07 or the specific law these rules purport to implement (section 376.065). Reduced to its essence, 16.032 involves nothing more than information gathering, an activity well within DNR's broad powers. In addition, with regard to 16.034, section 376.065(3) states that "additional cleanup equipment" is to be made available to reasonably clean up 10,000 gallons of pollutants, and all 16.034 does is list that equipment. Accordingly, we affirm the hearing officer's conclusion that these two proposed rules do not enlarge, contravene or modify DNR's delegated legislative authority.[3]

RULE 16.033
The final order of the hearing officer sets the stage for assessing the validity of proposed rule 16.033:
18. The gravamen of the dispute between the parties concerning the propriety of the proposed rule is a disagreement as to the interpretation to be accorded the provisions of section 376.065(3) which require a terminal facility to have "additional cleanup equipment" under the following circumstances:
... Within a reasonable time period, additional cleanup equipment shall be available ... to reasonably clean up 10,000 gallons of pollutants, unless the terminal facility does not store or service vessels having the capacity to carry that quantity as fuel or cargo. (Emphasis added)
19. Petitioner contends that the foregoing provision refers only to vessel capacity, and would read the exemption to apply where "the terminal facility does not store [vessels] or service vessels having the capacity to carry that quantity [10,000 gallons of pollutants] as fuel or cargo," irrespective of the capacity of the facility. So read, proposed rule 16N-16.033 conflicts with the exemption provided by section 376.065(3).
20. Contrasted with petitioner's contention, the Department interprets such provision to refer to both facility capacity and vessel capacity, and would consider the exemption applicable only if "the terminal facility does not store ... that quantity as fuel or cargo" and "the terminal facility does not... service vessels having the capacity to carry that quantity as fuel or cargo." So interpreted, the proposed rule is consistent with the exception.
Generally speaking, an administrative construction of a statute by an agency responsible for its enforcement should be accorded great deference and should not be overturned unless clearly erroneous. Pan Am. World Airways, Inc. v. Florida Pub. Serv. Comm'n, 427 So.2d 716, 719 (Fla. 1983). The agency's interpretation need not be the only one or the most desirable; it is enough if that interpretation is permissible under the language of the statute. Florida Power Corp. v. Department of Envtl. Regulation, 431 So.2d 684 (Fla. 1st DCA 1983). However, it is axiomatic that in ascertaining the meaning of statutory language, legislative intent is paramount, and the plain meaning of the statutory language is the starting point *1268 for determining that intent. See St. Petersburg Bank and Trust Co. v. Hamm, 414 So.2d 1071, 1073 (Fla. 1982); Lloyd Citrus Trucking, Inc. v. Department of Agriculture and Consumer Servs., 572 So.2d 977, 978 (Fla. 4th DCA 1990).
A plain reading of the exemption at issue reveals DNR's interpretation flies in the face of fundamental principles of grammar. The provision in issue states:
Within a reasonable time period, additional cleanup equipment shall be available ... to reasonably clean up 10,000 gallons of pollutants, unless the terminal facility does not store or service vessels having the capacity to carry that quantity as fuel or cargo.

(Emphasis added). DNR essentially claims the phrase "that quantity as fuel or cargo" is a direct object of the sentence, with "terminal facility" as the subject and "store" as the verb. However, since "vessels" immediately follows two verbs separated only by "or," then proper grammar dictates that "vessels" is the direct object and "having the capacity to carry that quantity as fuel or cargo" is a participial phrase modifying "vessels." As the phrase "that quantity as fuel or cargo" is part of the participial phrase modifying "vessels," it necessarily does not modify the subject "terminal facility." It follows, then, that the exemption refers only to vessel capacity; the capacity of a terminal facility's storage tanks has no bearing on the necessity for securing additional cleanup equipment.
The statutory scheme established by the legislature here fully supports this construction. Under the Act, no one is permitted to operate a terminal facility without first obtaining from DNR two separate certificates  a registration certificate as required by section 376.06, and the spill prevention and response certificate required by section 376.065. Pursuant to section 376.06, in order to receive a registration certificate, the terminal facility must provide DNR with information showing that the facility has sufficient equipment to clean up and contain a pollutant discharge. See section 376.06(7), (8). By this section, the legislature sought to ensure that each terminal facility had the capacity to clean up a spill that could occur at the site. Hence, the larger the fuel storage capacity at the facility, the greater the amount of equipment that must be available.
Since the registration requirements are geared toward the storage capacity of the terminal facility, it follows that the procedures established by section 376.065 for obtaining a spill prevention and response certificate are directed at vessel capacity. And because terminal facilities with a storage capacity over 10,000 gallons must have available sufficient equipment to clean up a spill commensurate with their size anyway in order to obtain a registration certificate, it would make no sense to compel the facility to obtain additional cleanup equipment simply because its storage capacity is greater than 10,000 gallons.[4]
Based on the foregoing, we reject DNR's interpretation of the exemption from the additional cleanup requirement found in section 376.065(3) as being clearly erroneous. Therefore, as proposed rule 16.033, which is based on that interpretation, increases the potential number of terminal facilities that would be required to procure such equipment, we reverse the hearing officer's conclusion that this proposed rule represents a valid exercise of DNR's delegated legislative authority.

NOTICE AND THE ECONOMIC IMPACT STATEMENT
Stuart Yacht Club also seeks reversal on the grounds that DNR failed to comply with *1269 section 120.54 when formulating its economic impact statement (EIS). In this regard, Stuart Yacht Club presents two arguments.
First, Stuart Yacht Club claims DNR failed to provide it or the appropriate organizations with the proper notice as required by section 120.54(1)(a).[5] However, while Stuart Yacht Club may not have received notice of the intended action directly from DNR, Stuart Yacht Club admits to indirectly receiving actual notice of the proposed rule. Moreover, the fact that Stuart Yacht Club filed a petition to challenge the validity of the rules demonstrates Stuart Yacht Club was not prejudiced by the lack of notice from DNR. Accordingly, any error in notification was harmless.
Secondly, Stuart Yacht Club attacks the EIS prepared by DNR on the ground that it fails to consider the impact of the proposed rules on "small business" as required by section 120.54(2). In its EIS, DNR concluded the proposed rules should have no impact on small business. According to DNR, the basis for this conclusion was an assumption that a small business would be a facility with a storage capacity of less than 10,000 gallons of pollutants.
Section 120.54(2)(a) mandates each agency consider, prior to the adoption of any rule, several methods for reducing the impact that the proposed rule will have on "small business" as that term is defined in the Small and Minority Business Assistance Act of 1985.[6] In addition, section 120.54(2)(b) requires the agency prepare a detailed EIS describing the impact of the proposed action, on, among other things, those small businesses.
According to section 120.54(2)(d), "The failure to provide an adequate statement of economic impact is a ground for holding the rule invalid." Notwithstanding, Florida courts have held that "preparation of an economic impact statement is a procedural requirement, and any defect in its preparation will not defeat an otherwise valid rule so long as the evidence proves that an agency fully considered the economic impact of its action or if it is established that the agency's proposed action will have no economic impact." Cataract Surgery Ctr. v. Health Care Cost Containment Bd., 581 So.2d 1359, 1364 (Fla. 1st DCA 1991). Unless the challenging party can show that the deficiencies in the EIS impair the fairness of the rulemaking proceedings or the correctness of the agency action, any deficiencies in the EIS are harmless. Plantation Residents' Ass'n v. School Bd. of Broward County, 424 So.2d 879 (Fla. 1st DCA 1982), rev. denied, 436 So.2d 100 (Fla. 1983).
We agree with the hearing officer that DNR's assumption does not withstand scrutiny because storage capacity bears no reasonable relationship to whether or not a terminal facility is a small business. Indeed, the fact that Stuart Yacht Club fits within the statutory definition of a small business, and yet has two 10,000 gallon tanks, clearly bears this out. Consequently, DNR had a statutorily imposed obligation to consider the impact on small business in its EIS. Significantly, had DNR properly determined in the first instance that this were the case, under section 120.54(3)(b), DNR would have been obliged to send written notice of the proposed rules to certain small and minority business concerns not less than 21 days prior to its action. Then, these interests would have been afforded the opportunity to offer alternatives regarding the impact of the rule on small business. See section 120.54(3)(b)1.
However, we disagree with the hearing officer's conclusion that DNR's error was harmless because the costs associated with the proposed rules were not shown to be unreasonable. Stuart Yacht Club's status as a small business subject to the proposed rules illustrates the proposed rules will have *1270 a substantial economic effect on small businesses. While it is undisputed that the estimated costs associated with compliance were not shown to be unreasonable, it is possible that small business advocates could have offered alternatives that were even more reasonable, or that reduced the cost to small business. For instance, small business interests could have offered alternatives to the additional equipment that is listed in 16.034(1). As the first district remarked in Cataract Surgery Center, 581 So.2d at 1364-65:
Section 120.54(3) specifically provides that certain parties are to receive notice and are to be allowed to provide input prior to agency adoption of rules. Failure to provide notice may have precluded these parties from providing input essential to protecting small businesses. It cannot be assumed that the [agency] would have rejected input from these representatives of small business.
Because it is clear DNR did not fully consider the economic impact of its action, the hearing officer erred in concluding that DNR's failure to assess the impact of its proposed rules on small business did not adversely affect the fairness of the rulemaking proceedings.[7] Accordingly, we reverse with directions that DNR prepare another EIS which permits small business representatives to present reasonable alternatives.

ATTORNEY'S FEES
Finally, Stuart Yacht Club seeks recovery of its attorney's fees pursuant to section 120.57(1)(b)10, which states in relevant part:
When there is an appeal, the court in its discretion may award reasonable attorney's fees and costs to the prevailing party if the court finds that ... the agency action which precipitated the appeal was a gross abuse of the agency's discretion.
While some of the action taken by DNR was incorrect, it does not rise to the level of being flagrant or inexcusable. Accordingly, we deny Stuart Yacht Club's request for attorney's fees.
ANSTEAD and WARNER, JJ., and MAGER, GERALD, Senior J., concur.
NOTES
[1] A "terminal facility" is defined in section 376.031(17) as

any waterfront or offshore facility of any kind, . .. which facility and related appurtenances are used or capable of being used for the purpose of ... pumping, storing, handling, [or] transferring ... pollutants [which includes gasoline per section 376.031(13)]... .
[2] The hearing officer, however, did strike down proposed rules 16.009(3) and 16.028 on this basis. That ruling has not been challenged in this appeal.
[3] As a corollary argument, Stuart Yacht Club urges that these proposed rules improperly enlarge DNR's delegated authority because the rules apply the requirements of section 376.065 to Stuart Yacht Club's facility when the legislature did not intend that result. In other words, and more specifically, Stuart Yacht Club maintains it is a "marine fueling facility" as defined in section 376.301, but not a "terminal facility"; and since the legislature only intended section 376.065 cover the latter, that section cannot be applied to Stuart Yacht Club (one of the former) via these proposed rules.

However, as note 1 illustrates, a terminal facility includes any waterfront facility used to pump or transfer pollutants. Thus, in light of the broad language used, we reject Stuart Yacht Club's contention that its facility does not fall within that definition merely because the facility qualifies as a "marine fueling facility." Nothing in the statutory scheme indicates these terms are mutually exclusive. Furthermore, had the legislature intended to except out marine fueling facilities from the requirements of obtaining a spill prevention and response certificate, it would have expressly said so. See section 376.06 (expressly excepting marine fueling facilities from obtaining registration certificates).
[4] Other sections of the Act further strengthen our conclusion. For instance, section 376.071 requires all vessels "operating in state waters with a storage capacity to carry 10,000 gallons or more of pollutants as fuel and cargo" to maintain their own "written ship-specific spill prevention and control contingency plan." (emphasis added). Furthermore, section 376.07(2)(a) mandates that all terminal facilities that "transfer[] heavy oil to or from a vessel with a heavy oil storage capacity greater than 10,000 shall be required to adequately boom or seal off the area ... during a transfer ... to minimize the escape of such pollutants from the containment area." (emphasis added). These sections reflect the legislature's choice to impose an additional cleanup burden only where the vessel can transport more than 10,000 gallons, without any mention of the terminal facility's storage capacity.
[5] Section 120.54(1)(a) provides that, prior to the adoption of any rule, an agency is required to mail notice of its intended action to, among others, those classes of persons to whom the intended action is directed.
[6] Section 288.703(1) of that Act defines "small business" as "an independently owned and operated business concern that employs 50 or fewer permanent full-time employees and that has a net worth of not more than $1 million." It is undisputed that Stuart Yacht Club qualifies as a small business under this definition.
[7] As an aside, we also note that the EIS does not comply with other provisions of section 120.54(2)(b). For instance, section 120.54(2)(b)2 requires the EIS include an estimate of the cost to all affected parties. However, the EIS produced here only includes an estimate of the first year cost to such parties. See Cataract Surgery Center, 581 So.2d at 1364 (indicating that an agency has an obligation to consider the economic impact of ongoing costs where such costs are reasonably ascertainable). Notably, it is not clear from the record whether the ongoing costs associated with the proposed rules at issue were reasonably ascertainable. In addition, though, the EIS neglects to include an estimated impact on competition or employment, or a detailed statement of the data and method used to reach the estimates made, as mandated by section 120.54(2)(b)3 and 4.