NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


FLORIDA AUDUBON SOCIETY,               )
                                       )
              Appellant,               )
                                       )
v.                                     )          Case No. 2D14-2328
                                       )
SUGAR CANE GROWERS                     )
COOPERATIVE OF FLORIDA, UNITED         )
STATES SUGAR CORPORATION,              )
SUGAR FARMS CO-OP, and SOUTH           )
FLORIDA WATER MANAGEMENT               )
DISTRICT,                              )
                                       )
              Appellees.               )
_____)

Opinion filed August 7, 2015.

Appeal from South Florida Water
Management District.

Michael G. Tanner and Thomas E. Bishop
of Tanner Bishop, Jacksonville, and Anna
H. Upton of Anna H. Upton, P.L.,
Tallahassee, for Appellant.

Kirk L. Burns, Jeffrey A. Collier, and James
E. Nutt, West Palm Beach, for Appellee
South Florida Water Management District.

Gary V. Perko and Mohamad O. Jazil of
Hopping Green & Sams, P.A., Tallahassee,
for Appellee Sugar Cane Growers
Cooperative of Florida.

Luna E. Phillips and Rick J. Burgess of

Gunster Yoakley & Stewart, Fort Lauderdale, for Appellee United States Sugar Corporation.

Silvia Alderman and Thomas A. Range of Akerman LLP, Tallahassee, and Joseph P. Klock, Jr., Gabriel E. Nieto, and Matthew P. Coglianese of Rasco Klock Perez & Nieto, P.L., Coral Gables, for Appellee Sugar Farms Co-op.

KHOUZAM, Judge.

The Florida Audubon Society ("Audubon") appeals the final administrative order entered in favor of the South Florida Water Management District ("the District") and several sugar cane growers ("the Sugar Appellees"), challenging permits that the District issued to the Sugar Appellees. Audubon argues that the permits violate the Everglades Forever Act ("EFA"). But because the permits align with the District's permissible interpretation of the EFA, we must affirm.

## I. BACKGROUND

As the record reflects, the Everglades ecosystem is one of a kind—an irreplaceable national treasure. It is home to an array of diverse plants and animals, including threatened and endangered species such as bald eagles, Florida panthers, and American crocodiles. But because large sections of the Everglades have been drained, only fifty percent of the historic Everglades still exists. Approximately 1158 square miles of land within the historic Everglades is now used for commercial farming and has been designated the Everglades Agricultural Area ("EAA"). The Everglades Forever Act was enacted to restore and protect the remaining ecosystem, designated

the Everglades Protection Area ("EvPA"). Drainage from the EAA has created destructively high levels of the nutrient phosphorous in the EvPA; thus, an important part of the restoration project is to lower phosphorous levels in the water that flows into the EvPA.

The permits at issue in this case regulate the discharge of phosphorous. In 2012, the District issued Everglades Works of the District ("WOD") Permits to U.S. Sugar Corporation (permit no. 50-00018-E), Sugar Farms Co-op (permit no. 50-00047-E), and Sugar Cane Growers Cooperative (permit no. 50-00031-E). The permits, all of which were renewals of prior WOD permits, require the sugar cane growers to continue implementing various on-farm techniques for reducing nutrients in agricultural discharges. These techniques are called Best Management Practices ("BMPs"). In turn, the permits allow the sugar cane growers to discharge water from their farms in the Everglades Agricultural Area into the Works of the District—a series of canals and related infrastructure that move the water to Stormwater Treatment Areas (STAs). The STAs are manmade wetlands constructed and operated by the District. The STAs further treat the water from the EAA, removing more phosphorous before discharging the water into the EvPA.[1] The discharge of water from the STAs into the EvPA is

---

[1]The EAA, STAs, and EvPA are pictured below in this figure taken from the 2013 South Florida Environmental Report, chapter 5, page 5-3:

authorized by two permits issued—also in 2012—to the District by the Florida Department of Environmental Protection ("FDEP"), one pursuant to Florida law (the Everglades Forever Act) and one pursuant to federal law (the Clean Water Act[2]). Audubon did not challenge the issuance of the STA permits to the District.

Instead, Audubon chose to challenge the issuance of the WOD permits to the Sugar Appellees, petitioning for administrative hearing with the District. The District referred the petitions to the Division of Administrative Hearings, and a final hearing was held before an Administrative Law Judge ("ALJ"). On February 10, 2014, the ALJ issued his recommended order, rejecting Audubon's arguments and finding that the District should issue the WOD permits to the Sugar Appellees. Audubon filed



[2]Permits for the discharge of pollutants are issued pursuant to the national pollutant discharge elimination system. See 33 U.S.C. § 1342 (2012).

exceptions to the recommended order, and the Executive Director of the District entered a final order on April 17, 2014.  The final order adopted the ALJ's recommended order and approved the issuance of the WOD permits.  Audubon appealed.

Audubon argues that the Sugar Appellees' permits violate the following language found in the Everglades Forever Act:

> As of December 31, 2006, all permits, including those issued prior to that date, shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs.  As of that date, no permittee's discharge shall cause or contribute to any violation of water quality standards in the Everglades Protection Area.

§ 373.4592(4)(f)(4), Fla. Stat. (2013).  But before we address Audubon's arguments, we must first examine the long and complex history of environmental regulation in the Everglades.

The BMP program and the STAs were first implemented in the 1990s.  In 1988, the federal government filed suit against the District and the Florida Department of Environmental Regulation, now known as the Florida Department of Environmental Protection, alleging violations of the state's water quality standard—principally, excessive levels of phosphorous—in the Everglades.  This litigation resulted in a settlement agreement that was approved by the federal court and entered as a consent decree in 1992.  United States v. S. Fla. Water Mgmt. Dist., 847 F. Supp. 1567 (S.D. Fla. 1992) aff'd in part, rev'd in part , 28 F.3d 1563 (11th Cir. 1994).  In the Consent Decree, the District and FDEP agreed to (1) implement the BMP program in the EAA to reduce the total phosphorus load by twenty-five percent as well as (2) construct and operate STAs to remove nutrients from the agricultural runoff before it enters the EvPA. The Consent Decree specifically stated that "[t]he primary strategy to remove nutrients

from agricultural runoff is the construction and operation of STAs."  The District and FDEP were also required to adopt a numeric water quality standard, interpreting the previous narrative standard prohibiting nutrient levels that would "cause an imbalance in natural populations of aquatic flora and fauna" in the EvPA.  Though the original deadline for long-term compliance with the water quality standards was July 1, 2002, that deadline was later extended to December 31, 2006.  In the event that the BMP program and the STAs did not meet the phosphorous criterion by the deadline, the Consent Decree provided that "the State Parties will implement additional remedies, such as any necessary expansion of STAs, more intensive management of the STAs, a more stringent EAA regulatory program, or a combination of the above."

In accordance with the Consent Decree, the District established the BMP program in 1992 under Florida Administrative Code, chapter 40E-63.  The program required EAA farmers to obtain WOD permits and to implement BMP plans.  The program's stated goal was "to reduce by 25% the total phosphorus loads discharged from the EAA."  Fla. Admin. Code R. 40E-63.101(1).  Accordingly, it was provided that permittees shall not be subject to compliance or enforcement actions by the District unless the EAA failed to comply with this goal.  Fla. Admin. Code R. 40E-63.145(3)(d), (e).

The STA project was expanded and the BMP program reinforced when the Everglades Forever Act was enacted in 1994.  See ch. 94-115, Laws of Fla.; § 373.4592, Fla. Stat. (1994).  The legislature directed the District and FDEP to expeditiously implement the Everglades Program, which included projects, regulations, and research as described by the Act.  See § 373.4592(1)(b), (2)(g).  Part of the

- 6 -

Everglades Program, called the Everglades Construction Project, provided for the expansion of the STAs. See § 373.4592(4)(a). Another part directed the District to continue to require and enforce BMPs in the EAA as well as research their effectiveness. See § 373.4592(4)(f). It is within this portion of the EFA that subsection (4)(f)(4), the crux of Audubon's argument in this case, appears. The EFA also required the District and FDEP to develop numeric water quality standards—including phosphorus criterion—for the EvPA by 2003 and set December 31, 2006, as a deadline for compliance with those standards. See § 373.4592(4)(e), (10).

In order to comply with the requirements of the EFA, FDEP adopted the phosphorus criterion for the EvPA of 10 parts per billion (ppb) in 2003. Fla. Admin. Code R. 62-302.540(4).[3] And because the 10ppb limit was not being met, the District and FDEP developed the Everglades Protection Area Tributary Basins Long Term Plan for Achieving Water Quality Goals ("Long-Term Plan"). The Long-Term Plan acknowledged that the combined performance of the BMP program and the STAs had exceeded expectations but that further measures were needed to comply with the 10ppb phosphorus criterion by December 31, 2006. The Long-Term Plan set forth what was considered "the most aggressive approach to achieving the goals of the Everglades Forever Act supportable by current scientific and technical knowledge base." This approach consisted of pre-2006 and post-2006 projects and strategies. Pre-2006 projects included structural and operational modifications to the existing STAs and

---

[3]The phosphorus criterion is measured by a long-term geometric mean, taking into account spatial and temporal variability. Florida Administrative Code Rule 62-302.540(4)(d) provides specific methods for determining whether the phosphorous criterion has been achieved in the EvPA.

imposition of additional BMPs outside the EAA. If these measures alone did not meet the phosphorus goal, post-2006 projects would be employed and would include the expansion of the STAs and "implementation of more aggressive urban and agricultural source control programs." The legislature amended the EFA in 2003 to incorporate the Long-Term Plan, finding "that the Long-Term Plan provides the best available phosphorus reduction technology based on a combination of the BMPs and STAs." § 373.4592(3)(b), Fla. Stat. (2003); see also ch. 2003-12 & ch. 2003-394, Laws of Fla. The initial phase of the Plan was to be implemented without delay over a thirteen-year period (2003-2016), and the legislature intended to review the EFA ten years after the implementation of the initial phase. § 373.4592(3)(d), (e). The second ten-year phase, if needed, was to be approved by the legislature and codified in the EFA before the projects were implemented. § 373.4592(3)(d).

By 2012, the 10ppb phosphorous limit was still not being met in the EvPA. So the FDEP and the District developed the Restoration Strategies Water Quality Plan ("Restoration Strategies"), a suite of additional water quality projects meant to work in conjunction with existing STAs to achieve compliance with the phosphorous criterion. These projects would expand the STAs and add Flow Equalization Basins ("FEBs"), designed to temper peak stormwater flows before delivery into the STAs. The Restoration Strategies did not include the implementation of more aggressive BMPs; to the contrary, the plan expressly assumed that the phosphorous reductions being achieved by the BMP program would remain the same. Indeed, the Restoration Strategies stated that it would "build upon the success of the existing BMP Regulatory

- 8 -

Program by focusing on areas and projects with the greatest potential to further improve water quality."

The legislature, in turn, amended the EFA in 2013 to modify the Long-Term Plan to add the Restoration Strategies. See ch. 2013-59, Laws of Fla. The legislature added a finding "that implementation of BMPs, funded by the owners and users of land in the EAA, effectively reduces nutrients in the waters flowing into the Everglades Protection Area." § 373.4592(1)(g), Fla. Stat. (2013). Language referencing the two phases of the Long-Term Plan was removed and replaced with language stating that the legislature would review the Act at least ten years after the implementation of the Long-Term Plan. The Restoration Strategies were to be funded through the 2023-2024 fiscal year. An increased annual Everglades agricultural privilege tax was extended to 2035 (it had previously been provided to sunset in 2016). The proceeds from the increased tax would be "used for design, construction, and implementation of the Long-Term Plan, including operation and maintenance, and research for the projects and strategies in the Long-Term Plan, including the enhancements and operation and maintenance of the Everglades Construction Project." § 373.4592(6)(c)(6), Fla. Stat. (2013).

The 2012 permits issued to the District by FDEP not only authorize the discharge of water from the STAs into the EvPA but also require the District to implement the Restoration Strategies. The permits were issued in reliance on two substantively identical Consent Orders entered into between the District and FDEP. The Consent Orders acknowledge that the 10ppb phosphorous criterion is not being met—indeed, total phosphorous levels in discharges from the best performing STA

have averaged 17ppb.  Thus, even though the STAs have significantly reduced the amount of phosphorous entering the EvPA, additional corrective actions are needed. The corrective actions outlined in the Consent Orders provide for projects with completion deadlines spanning from 2012 to 2025.  These projects are expected to bring the water being discharged from the STAs into compliance with the phosphorous standard.  Importantly, the Consent Orders specify that until these corrective actions have been completed within the deadlines provided, FDEP will allow the STAs to continue to operate.

The WOD permits sought by the Sugar Appellees in this case allow them to discharge water into the STAs on the condition that they continue to implement BMPs.  Unlike the STAs, the BMP program has far surpassed its phosphorus reduction goal.  The goal of the BMP program was to reduce phosphorous loads by twenty-five percent from historic levels.  The EAA has achieved an overall reduction of fifty-five percent, and even achieved a seventy-one percent reduction for water year 2012.  The objective of the BMP program has not changed; as already noted, the legislature acknowledged in the 2013 amendments to the EFA "that implementation of BMPs, funded by the owners and users of land in the EAA, effectively reduces nutrients in the waters flowing into the Everglades Protection Area."  § 373.4592(1)(g), Fla. Stat. (2013). FDEP and the District, in turn, found that "Best Management Practices (BMPs) have reduced phosphorus loads from the Everglades Agricultural Area to the EvPA by more than twice the amount required by existing rules."  Fla. Admin. Code R. 62-302.540(2)(b).

With this background in mind, we turn to Audubon's arguments.

II. ANALYSIS

As already noted, Audubon's challenge to the Sugar Appellees' WOD permits centers on the following language found in the Everglades Forever Act:

> As of December 31, 2006, all permits, including those issued prior to that date, shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs. As of that date, no permittee's discharge shall cause or contribute to any violation of water quality standards in the Everglades Protection Area.

§ 373.4592(4)(f)(4), Fla. Stat. Audubon argues that the WOD permits violate subsection (4)(f)(4) on two bases: first, because they do not impose "additional water quality measures" beyond those imposed in permits issued before December 31, 2006; and second, because the Sugar Appellees' discharges "cause or contribute to" ongoing water quality violations in the EvPA. We address each argument in turn.

*A. Standard of Review*

Initially, we point out that "an agency bears the primary responsibility to interpret statutes and rules within its regulatory expertise and jurisdiction." Duke's Steakhouse Ft. Myers, Inc. v. G5 Props., LLC, 106 So. 3d 12, 15 (Fla. 2d DCA 2013). "Even if somehow problematic, 'an agency's interpretation of a statute it is charged with enforcing is entitled to great deference.' " Morris v. Div. of Ret., 696 So. 2d 380, 384 (Fla. 1st DCA 1997) (quoting Ameristeel Corp. v. Clark, 691 So. 2d 473, 477 (Fla. 1997)). Moreover, "[a]n agency's interpretation of such statutes and rules does not have to be the only reasonable interpretation—only a permissible one." Duke's Steakhouse, 106 So. 3d at 15; see also Stuart Yacht Club & Marina, Inc. v. State, Dep't

of Nat. Res., 625 So. 2d 1263, 1267 (Fla. 4th DCA 1993) ("The agency's interpretation need not be the only one or the most desirable; it is enough if that interpretation is permissible under the language of the statute.").  In other words, "[w]hen an agency committed with authority to implement a statute construes the statute in a permissible way, that interpretation must be sustained even though another interpretation may be possible or even, in the view of some, preferable."  Humhosco, Inc. v. Dep't of Health & Rehab. Servs., 476 So. 2d 258, 261 (Fla. 1st DCA 1985).  The agency's interpretation should only be reversed if clearly erroneous.  Duke's Steakhouse, 106 So. 3d at 15-16.

### B. Whether the Sugar Appellees are Required to Implement Additional Water Quality Measures

The first sentence of subsection (4)(f)(4) provides that "[a]s of December 31, 2006, all permits, including those issued prior to that date, shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs."  Audubon argues that the plain language of this sentence requires additional BMPs imposed in all WOD permits issued after December 31, 2006, because the water currently being released from the STAs into the EvPA does not meet the 10ppb criterion.

But the District has reasonably determined that the first sentence of (4)(f)(4) does not require WOD permits to include more aggressive BMPs because the treatment actually provided by the STAs and the effectiveness of the BMPs must be taken into account.  Accordingly, the District must consider the water quality that will be achieved by approved projects.  The legislature has adopted the Long-Term Plan, modified by the Restoration Strategies, as the current overarching plan to achieve the

10ppb phosphorous criterion in the EvPA. This is a cohesive plan to address phosphorus pollution in the Everglades, and it relies on expansions and enhancements of the STAs as opposed to more aggressive BMPs. Focusing on enhancements to the STAs is reasonable because the BMP program has far exceeded its goal of reducing phosphorous levels by twenty-five percent. As the Long-Term Plan and Restoration Strategies are meant to meet the phosphorous criterion without the imposition of more aggressive BMPs, it would be contradictory to interpret the first sentence of (4)(f)(4) to mandate them. We also note that the Sugar Appellees are contributing to the restoration of the EvPA not only with continuing BMPs but also by paying the increased agricultural privilege tax that helps fund the Long-Term Plan.

Audubon claims that the Long-Term Plan and Restoration Strategies cannot satisfy subsection (4)(f)(4) because the Consent Decree provides that "[t]he State parties shall not implement more intensive management of the STAs as the sole additional remedy." But the Consent Decree itself contemplates that expansion of the STAs is different than more intensive management of the STAs. The Consent Decree specifically states that if the water quality standard is not met, "[t]he State Parties will implement additional remedies, such as any necessary expansion of STAs, more intensive management of STAs, a more stringent EAA regulatory program, or a combination of the above." Thus, the District's interpretation of subsection (4)(f)(4) does not conflict with the Consent Decree—instead, this portion of the Consent Decree reinforces that the District had the discretion to choose the most effective combination of programs to meet the phosphorous criterion.

Audubon also insists that the Long-Term Plan and Restoration Strategies cannot satisfy subsection (4)(f)(4) because these projects will not be complete until 2025. However, we cannot read subsection (4)(f)(4) in isolation. See Fla. Dep't of Envtl. Prot. v. ContractPoint Fla. Parks, LLC, 986 So. 2d 1260, 1265-66 (Fla. 2008) ("[I]f a *part* of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the *same statute* or others in pari materia, the Court will examine the entire act and those in *pari materia* in order to ascertain the overall legislative intent." (quoting Fla. State Racing Comm'n v. McLaughlin, 102 So. 2d 574, 575-76 (Fla. 1958))). Though 2006 has passed and the 10 ppb phosphorous criterion has not yet been met, the EFA provides that "[i]t is the intent of the Legislature to provide a sufficient period of time for construction, testing, and research, so that the benefits of the Long-Term Plan will be determined and maximized prior to requiring additional measures." § 373.4592(1)(g). Requiring more aggressive BMPs before the Long-Term Plan and Restoration Strategies have been fully implemented would contradict this intention. Audubon's interpretation of subsection (4)(f)(4) would require additional BMPs on a farm-by-farm basis where there is a comprehensive plan already in place, and these additional BMPs would become unnecessary upon the completion of the Restoration Strategies. This result would be absurd, and "a statutory provision should not be construed in such a way that it renders the statute meaningless or leads to absurd results." Warner v. City of Boca Raton, 887 So. 2d 1023, 1033 n.9 (Fla. 2004). The District's interpretation, on the other hand, harmonizes the entire EFA and avoids an interpretation of subsection (4)(f)(4) that would conflict with the rest of the Act. See Forsythe v. Longboat Key Beach Erosion

- 14 -

Control Dist., 604 So. 2d 452, 455 (Fla. 1992) ("It is axiomatic that all parts of a statute must be read *together* in order to achieve a consistent whole.").  Its interpretation is reinforced by the Consent Decree and STA permits along with the Consent Orders.

### C. Whether the Sugar Appellees' Discharge Causes or Contributes to a Violation of Water Quality Standards in the EvPA

The second sentence of subsection (4)(f)(4) provides that "[a]s of that date [December 31, 2006], no permittee's discharge shall cause or contribute to any violation of water quality standards in the Everglades Protection Area."  Audubon argues that the Sugar Appellees' discharges fail to comply with the plain meaning of this provision because they "cause and contribute" to a "violation of water quality standards" in the EvPA.  They point to the discharges from the STAs into the EvPA and emphasize that these discharges have not met the 10ppb phosphorous criterion.

But the District reasonably determined that the discharge from the STAs is not a "violation of water quality standards" because it has been approved by the STA permits and Consent Orders.  FDEP, acknowledging that the 10ppb phosphorous criterion is not yet being met, approved corrective measures and set deadlines for the implementation of these measures through 2025.  These measures—once completed—are expected to achieve the phosphorous criterion.  As long as the District is timely completing these measures, FDEP will allow the District to continue to discharge water into the EvPA.  It would be inconsistent to consider the same discharge of water from the STAs into the EvPA a violation of water quality standards for the purpose of the WOD permits when the identical discharge has been approved by FDEP in the STA permits and Consent Orders pursuant to both Florida law (the Everglades Forever Act) and federal law (the Clean Water Act).  To challenge the adequacy of the approved

- 15 -

corrective measures and the authorization of the discharge from the STAs into the EvPA, Audubon should have challenged the STA permits approving these measures and allowing that discharge. Cf. Perdue v. TJ Palm Assocs., Ltd., 755 So. 2d 660, 668 (Fla. 4th DCA 1999) (affirming the District's denial of a challenge to the issuance of a construction permit where "the activities authorized by that permit had already been previously considered when the conceptual permit was issued by the District"). Unfortunately, Audubon did not challenge the STA permits.

Audubon points to a proposed change in the 2013 legislation to the "cause or contribute" provision of subsection (4)(f)(4): "As of that date [December 31, 2006], no permittee's discharge shall be deemed to cause or contribute to any violation of water quality standards in the Everglades Protection Area if the discharge is in compliance with applicable permits and any associated orders." H.B. 7065, 150th Reg. Sess. (Fla. 2013). But we have no way of knowing why the proposed revision was not enacted—indeed, the changes may have been rejected because they merely tracked existing law and thus would be redundant and unnecessary. This situation is different than that addressed in Don King Productions, Inc. v. Chavez, 717 So. 2d 1094, 1095 (Fla. 4th DCA 1998), on which Audubon relies, because in that case the statutory section at issue had been amended in its final version to delete one provision and substitute another, conflicting provision.

Finally, Audubon points out that the ALJ did not even allow Audubon to present evidence that the Sugar Appellees' farming operations were causing or contributing to water quality violations in the EvPA. But it was appropriate for the ALJ to prevent Audubon from presenting this evidence because there is no dispute that the

phosphorous level in the EvPA is higher than 10ppb.  Regardless of the level of phosphorus being discharged into the EvPA, those discharges have been authorized in the STA permits and thus are not necessarily a "violation of water quality standards" for purposes of subsection (4)(f)(4).

Though Audubon may disagree with the District's interpretation of subsection (4)(f)(4) as a matter of policy, the District's interpretation was permissible and therefore we cannot disturb it.  We must affirm.

Affirmed.

KELLY and LaROSE, JJ., Concur.